In the Matter of Proving the Last Will and Testament of JOHN WHEELER, Deceased.

*(Surrogate's Court, Rensselaer County, Filed October, 1893.)*

1. EVIDENCE—DECLARATIONS.

All acts or declarations, forming part of the act or transaction to be proved so as to explain or qualify it, are admissible when such transaction or act forms the fact in issue or is deemed relevant thereto.

2. WILL—TESTAMENTARY CAPACITY.

No presumption of want of testamentary capacity arises from old age alone, nor from enfeebled condition of body or mind.

3. SAME—UNDUE INFLUENCE.

Where it has been once proved that a will has been executed with due solemnities by a person of competent understanding and apparently a free agent, the burden of proving that it was executed under undue influence is upon the party who alleges it.

4. SAME.

Where the alleged testator is quite old and somewhat weakened, by reason of age and infirmities, both in body and mind, the burden is shifted upon the party in whose interest an important change in the will is made.

5. SAME.

The presumption, which the law raises under such circumstances, is one of fact and not of law, and may be repelled.

APPLICATION for the probate of the will of John Wheeler, deceased.

King & Speck, for proponent; Cornelius Snyder and John P. Albertson (William J. R. Roche, of counsel), for contestants.

LANSING, S.—John Wheeler, late of the town of Sandlake, in this county, died March 3, 1891, aged 86 years. He left surviving him no widow, child or descendant, brothers or sisters, but nephews and nieces and grand nephews and nieces, some twenty in number, his only heirs at law and next of kin. His wife died some fifteen years before him and after the death of his wife and down to the time of his own death, he lived on his farm in Sandlake in the family of his nephew, George P. Gardner. The deceased had taken his nephew into his family upon the death of his mother, Wheeler's sister, when he was an infant only a few weeks old, and they lived together upon the farm for a period of more than fifty years.

The farm upon which he lived consisted of about 150 acres, the value of which is variously estimated from $5,000 to $8,000. He was also the owner of a small amount of personal property of the value of about $1,500.

The instrument propounded for probate as his last will was executed September 22, 1890, about six months before his death. The will was prepared by his neighbor and friend, Andrew J. Smart, who also attended its execution. It was witnessed by two persons residing in the neighborhood, who had known the testator for many years. By this will the bulk of the testator's property, which consisted of his farm, stock and farm equipments, was devised to his nephew, George P. Gardner, subject to the payment of $1,500. Legacies of $50 each were given to some ten of his nephews, nieces, grand-nephews and grand-nieces, and two legacies of $100 each to the wife and daughter of George P. Gardner. It appeared that Mr. Smart drew and attended the execution of a prior will, in 1885 or 1886, which was destroyed at the direction of the testator after the execution of the will of September 22, 1890. All the legatees mentioned in the earlier will are also legatees in the will in question except Col. Silas Wheeler and John A. Coons, both of whom died after the making of the former will, and except, also, Hiram Taylor, a grand-nephew of the deceased, who was given $1,200 under the will of 1885, and nothing under the

present will. No legacies were given to the wife and daughter of George P. Gardner in the first will.

By the former will George P. Gardner and John A. Coons, since deceased, were named as residuary legatees and devisees, but in the last will George P. Gardner remained as the sole residuary legatee and devisee.

By the former will George P. Gardner was given the farm and its equipments in the precise terms employed in present will, except that in former will he took the farm subject to the payment of $2,500 instead of $1,500, as provided in the last will. A legacy of $100 was given to each of the four children of the testator's grand-nephew, Hiram Taylor, and a like sum was given to each of testator's nephews and nieces, Col. S. Wheeler, Michael Wheeler, John C. Wheeler, Alvina Goewey and Zilpha Fielding, and to his grand-nieces, Cora Metcalf and Teletta Upham; each of these legacies was reduced to $50 under the last will.

Andrew J. Smart was named as executor in each will, but filed his renunciation after presenting the latter instrument for probate.

None of the contestants, except Hiram Taylor, a grand-nephew; John C. Wheeler, nephew, and Zilpha Fielding and Lucy Metcalf, nieces, are mentioned as legatees in the present will or in the will of 1885. The three last named nephews and nieces receive $50 less in the present will than in the will of 1885.

The substantial difference between the will of 1885 and the present will, so far as the contestants are concerned, is the omission in the latter instrument of a legacy of $1,200 to Hiram Taylor contained in the will of 1885.

The probate of the will is challenged by the contestants upon the ground, first, that the testator did not possess testamentary capacity; second, that undue influence was exercised over the testator by George P. Gardner in procuring the present will.

I shall not attempt an extended analysis of the evidence, which is very voluminous, upon the question of testamentary

capacity of the alleged testator. It is sufficient to say, after a very careful examination of the evidence, I am satisfied, notwithstanding the age of the testator and his considerable impairment in physical and mental vigor that he possessed sufficient mind and memory to make the will in question.

. It is well settled in this State that "no presumption of testamentary incapacity arises from old age alone. Nor can incapacity to make a will be inferred from enfeebled condition of mind or body." . Horn v. Pullman, 72 N. Y. 269; Van Guysling v. Van Kuren, 35 id. 70; Bleecker v. Lynch, 1 Brad. 458, 472;. Van Alst v. Hunter, 5 Johns. Ch. 148.

In the latter case the Chancellor says: "The control which the law still gives to a man over the disposition of his property, is one of the most efficient means which he has in protracted life to command the attention due to his infirmities. The will of such an aged man ought to be regarded with great tenderness, when it appears not to have been produced by fraudulent arts and contains those very dispositions which the circumstances and the situation and the course of natural affection dictated."

The true test of testamentary capacity is, did the testator have sufficient intelligence to comprehend his property, his relations to those who are or may be the objects of his bounty and the scope and meaning of the provisions of his will? If so, he was in law of sound mind and memory. Horn v. Pullman, *supra;* Delafield v. Parish, 25 N. Y. 10.

"It is not necessary that he should be able to collect all these in one review. If he understands in detail all that he is about and chooses with understanding and reason between one disposition and another, it is sufficient for the making of the will." Wilson v. Mitchell, 101 Penn. St. 492, 502; Schouler on Wills, section 83.

"Nor is it necessary that the particular will and its provisions should have originated with the testator, provided he understands and adopts and sanctions whatever disposition was proposed and embodied in the instrument." Tunison v. Tunison, 4 Brad. 138; Schouler on Wills, section 233.

Let us consider the testimony in the light of these rules. It appears that although the testator's health was quite feeble, yet he was able to be about the house when the will was made and during the same fall and after the will was executed, was engaged in light work about the farm. He dug potatoes, husked corn and busied himself about such farm work as an industrious old man might do.

Considerable testimony was given by the contestants tending to show that the deceased was very feeble physically during the last years of his life; that he was afflicted with a hacking cough, had occasional lapses of memory, that he wandered off and was lost, on one occasion (the same year the will was executed), and was found in the field upon his farm, where he had fallen upon the ground and remained unable to rise. That upon that and other occasions he appeared dazed and confused and could not walk without assistance, and on occasions complained of his head and said he could not remember as well as he used to. The family physician, Dr. Nichols also testified that in his judgment his mind was impaired; that in his opinion the deceased was not of sound mind on the 22d day of September, 1891, but the doctor on further examination stated that he could not express such an opinion disconnected from knowledge which he gained in attending the deceased professionally. This testimony is, therefore, inadmissible, and was excluded. But if retained sufficient facts were not stated by him to warrant me in accepting this opinion even in connection with the contestnats' other evidence against a great body of testimony from the acquaintances, neighbors and friends of deceased, who testified from personal intercourse wth him during the latter years of his life, touching his health, intelligence, physical and mental vigor, as evidenced by his appearance, conduct and conversation, to the effect that not only about the time of the making of the will, but for a considerable period prior and subsequent thereto, the testator possessed a large measure of intelligence and mental vigor for a man of his years; that he was affected with no delusions, that

his conduct was natural and his conversation rational and intelligent, compelling the conclusion that testator was possessed of a sound and disposing mind and memory when the will was executed on the 22d of September, 1891. I have not overlooked the fact that Mr. Smart, the draughtsman of the will and a very intelligent and conscientious witness, testified that "the testator's mind was not on that occasion sprightly, but was dull and heavy, did not work well, his memory very much impaired." Yet he testified that he read the will to Mr. Wheeler twice, first the draft or memorandum, then the prepared instrument (indeed, the prepared instrument itself was read to him twice, once on each of two different days before its execution), and he states, "I think he understood it (the will) as I read it; he probably understood the paragraphs as I read them;" he adds, "but possibly it slipped his mind as I read the next one," a surmise I hardly think justified by his description of what occurred there. For Smart states that Mr. Wheeler answered all the questions which he asked him in regard to the changes which he desired to make in the former will without requiring any assistance, and further, that before he (Smart) commenced to prepare the memorandum for the present will, the deceased stated to him his reasons for changing the former will, and the changes were made in accordance with the reasons so stated. And, finally, as to whether the testator understood the changes made in the former will and the provisions of the present will, the witness testified: "It looked as though he (testator) had made up his mind, before he commenced, to cut them (the legacies) down one-half, except one, and that was to be stricken out." And this is substantially all he did by the latter will. I am quite sure the testator knew what he intended to do in disposing of his property by his will and that he carried out his intention.

Upon the whole, then, I conclude, in the light of all the testimony and the rules of law applicable thereto, that the testator was of sound mind and memory at the time of the execution of the will.

But another and more serious question is presented by the second defense, namely, that the will was induced by undue influence exercised by George P. Gardner the principal beneficiary. For the discussion of this question, it is important, preliminarily, to determine the admissibility of certain testimony which was offered upon the trial, decision upon which was reserved. It is charged that George P. Gadner, the principal beneficiary under the will, improperly influenced the mind of the testator to omit the legacy of $1,200 from the present will which the testator had given in the former will to Hiram Taylor, a grand-nephew of the testator, who had lived with him a great many years. For the purpose of proving this charge, it was material and proper for the contestants to show not only interest and opportunity, but a disposition on the part of Gardner to produce the result. For the purpose of showing this disposition it was proven that Gardner personally procured the attendance of the draughtsman to draw the will. In this connection the contestants offered to show further that on the way over to Wheeler's house a distance of a mile or two Gardner said to the draughtsman that the old gentleman (Mr. Wheeler) wanted alterations made in the will and wished him (Mr. Smart) to come down and make them; that Gardner further said "that he was surprised that Mr. Wheeler should have given his property or any of it to a drunkard, and he named as the drunkard Hiram Taylor;" and further said "that the old gentleman had given away more property than he had" and "had he known that there was any such intention to give his property to Hiram Taylor, he would have had a deed of the farm before that."

The introduction of this testimony was strenuously resisted upon the ground that the declarations or admissions of one of several legatees are not admissible to impeach the validity of a will, where such admissions may affect others not in privity with the party. In support of this position they cite: Matter of the Will of Baird, 47 Hun, 77, 14 St. Rep. 172; Brush v. Holland, 3 Brad. 240-242; Shailer v. Bumstead, 99 Mass. 112, 124.

Undoubtedly such declarations are inadmissible as independent testimony to show what a legatee or devisee had done or intended to do, to improperly influence a testamentary disposition of property. But it seems to me that for the purpose of showing motive or disposition to do so, the statement made to the draughtsman by the devisee in connection with this act of securing the attendance of the draughtsman, was part of the *res gestae* and is competent. It might serve to characterize the act of the devisee in procuring the draughtsman, which was proven to show a disposition to do the act charged. The declaration seems clearly within the rule that all acts or declarations forming part of the act or transaction to be proved so as to explain or qualify it, are admissible when such transaction or act form the fact in issue or is deemed relevant thereto. Stevens Digest Law of Ev. page 6; Waldele v. N. Y. C. & H. R. R. 95 N. Y. 274; People v. Davis, 56 N. Y. 95, 102; Eighmy v. People, 79 N. Y. 546.

Surrogate Bradford, in the case of Brush v. Holland, *supra*, while holding such declarations competent, insists that they should have little weight as reflecting the mind of the person making them, since they may spring from a boastful spirit. But it is not necessary to determine the weight of this testimony here.

Having decided to admit this evidence, it is important to consider its effect in determining the burden of proof. Ordinarily when it has been well proven that a will has been executed with due solemnities by a person of competent understanding and apparently a free agent, the burden of proving that it was executed under undue influence is upon the party who alleges it. Tyler v. Gardiner, 35 N. Y. 559; Baldwin v. Parker, 99 Mass 79, 85; *In re* Will of Martin, 98 N. Y. 196; Matter of Green, 67 Hun, 531, 48 St. Rep. 450.

But it seems to me, where, as in this case, interest and opportunity are shown; and testimony tending to show a disposition upon the part of the person charged with undue influence has been introduced, and it further appears that the party charged

had peculiar opportunity of influencing the mind of the alleged testator by reason of his being a member of his family, de-dependent upon him for the supply of his wants and the comforts of a home; and further that the alleged testator was quite old and somewhat weakened, by reason of age and infirmities, both in body and mind, that the burden is shifted upon the party in whose interest an important change in a will is made; and that he should be called upon to produce satisfactory evidence that the provisions made in his own favor in the later will, following the change in the former will, was the result of the free act and will of the testator, entirely uninfluenced by any device or improper influence upon his part.

The presumption which the law raises under such circumstances is one of fact and not of law and may be repelled. Marx v. McGlynn, 88 N. Y. 371.

The proponent in this case insists that he has assumed the burden and furnished ample evidence repelling any and every imputation of fraud or undue influence on his part, and shown that the instrument propounded was the free act and will of the testator. In support of this contention he insists that the testmony shows clearly and satisfactorily, first, that the will was executed in due form with all the solemnities required by the statute, by a person of sound mind; that it was made after careful explanation and consideration of every paragraph of the will; that several hours were spent in its preparation by the testator and the draughtsman upon two separate days; that it was carefully read to him twice, upon different days, before its execution, and received his approval; that the history of the drafting and the execution of the will show that no undue influence was exerted by anyone at that time; in addition thereto the draughtsman testified, "I think when I arrived there he (testator) knew what he was going to do." Second, that the will in question was drawn along the lines of the former will prepared five or six years before by the same draughtsman, without the knowledge of Gardner, when the testator had the aid of an old and tried friend, and was engaged several hours

in its preparation and framed it with full knowledge of, and after due consideration, of the claims of his various relatives upon his bounty. That said will contained substantially the same provisions in favor of George P. Gardner as the present will. That by the former will George P. Gardner was given the farm, the stock and its equipments, charged with the payment of legacies to the amount of $2,500. That at that time the farm was of the probable value of $10,000 or $12,000. That at the time of the death of the testator the farm was estimated to be worth only from $5,000 to $8,000 showing an estimated shrinkage in value from one-third to one-half. Third, that at the time the last will was drawn, the testator stated to Mr. Smart, the draughtsman, the reasons he desired to change his will. The reasons stated were that "he did not want his property drunk up in rum;" that he did not want to give money to dead men, and that he had given away more than he had. That it appeared that the will of 1885 was changed only so as to conform to the instructions which the testator gave to the draughtsman. That the changes made were, first, to eliminate the names of those deceased since the former will; second, to lessen the amounts given to the ten or twelve legatees in the former will from $100 to fifty dollars, only three of whom are contestants of the present will. That the remaining contestants, except Hiram Taylor, received nothing under either the former or later will; third, that the testator believed Hiram Taylor to be a drunkard, and for that reason omitted him in the new will. That it was of him the testator spoke when he said, "I don't want my property drunk up in rum." Fourth, that George P. Gardner was the child by adoption and the object of affection of the testator; that he was reared in his family, given his family name, which he retained until he was twenty-one years of age (when it was changed by reason of some difficulty about voting). That George married, brought his wife to his home, and after the death of the testator's wife, twelve or fifteen years prior to his own, the testator became a member of Gardner's family on the farm, ate at his table and resided with

him until his death, a period of more than fifty years. That the mutually acknowledged relation of parent and child had existed between them during this entire time. That the testator had an abiding affection for George, which among other evidences was manifested by the fact that although Hiram Taylor (who was also reared in the family of the deceased and remained with him from the time he was three years of age until he was about twenty-three) was in his youthful days much more tractable, industrious and respectful than George in his treatment of the testator, yet Hiram was permitted to leave when he married, while George was retained and continued with the testator until his death. That although a considerable amount of testimony was given showing that George at times was disrespectful to, and at times chided, the testator, using language more forcible than polite, yet it appeared that upon most occasions it arose from solicitude on the part of George for the health or safety of the testator. And it is insisted that the deceased never received any intentionally harsh or unkind treatment from Gardner or his family and never even complained of any; that on the contrary the evidence shows that his treatment by Gardner, and especially by Gardner's family, was very kind and considerate and was so regarded by the deceased. Fifth, that considering the relations of these parties, there is nothing in the change made in Gardner's favor by the later will, charging the farm with the payment of $1,500 instead of $2,500 or the legacy of $100 each to his wife and daughter, which may not reasonably be presumed to have resulted from motives of gratitude and affection or been prompted (in view of the change of the value of the testator's estate) by his desire of carrying out his original intent of giving Gardner the farm without burdensome charges. And finally, that the deceased stated repeatedly during his life, when in full health and strength, that he regarded George P. Gardner as his son and expected his property to go to him, and complained that his other relations had shown him little or no attention and said they would get but little from him.

To this contention the contestants reply that, assuming that

the testator did intend to make George P. Gardner his principal beneficiary and give him the bulk of his property, yet it is apparent that George P. Gardner did exercise his influence to exclude Hiram Taylor from any share in the testator's property, and that he substantially received the benefit of it for himself and his family and they insist that the very fact that the testator was found uttering the same reasons for changing his will as those which were given by George P. Gardner to the draughtsman when he was conveying him to the testator's house to make the change furnishes cogent evidence that this particular act was inspired by George P. Gardner, and they insist that his will dominated the will of this feeble old man and produced the change in the will against him.

This contention has much force. and deserves and has received careful attention. But it seems to me that it is met by this consideration. If it was not true, as stated and believed by the testator, that Hiram Taylor was a drunkard and that "his money would be likely to be drunk up in rum," it was in the power of the contestants to show that fact. They failed to do so, although ample opportunity was afforded upon the trial and even after the trial, a proposition on the part of the surrogate to openthe case and take further testimony upon that point, if either party desired, was declined. It is clear that the deceased believed the charge; and acting upon that belief it certainly was not an unreasonable act to exclude Hiram Taylor from any share or portion of his property.

Although I have held that the burden of proof was upon proponent to repel the presumption of undue influence arising from Gardner's declarations and his somewhat peculiar relations to the deceased in this case, yet the proponent having shown that the testator held and gave a sufficient reason for the change in his will, it seems to me that it then devolved upon the contestants, in order to fasten their charge of undue influence upon George P. Gardner, to show not only that the charge was untrue, but that George P. Gardner, knowing it to be un-

36

true, or not believing or having reason to believe it to be true, induced the testator to believe it to be true, and thus produced the result in question.

George P. Gardner could not testify under the law as to what he did or did not tell the testator upon the subject, but it is very obvious that the testator, who was upon good terms with his neighbors and in constant intercourse with them and with the men who were employed upon the farm—of whom there were several every year—had ample opportunity to learn of the character and habits of Hiram Taylor, who resided in the same neighborhood, from others beside George P. Gardner. So that no inference is necessarily drawn from the fact that Gardner and the deceased held and expressed the same opinion concerning the habits and character of Taylor, that the testator received his information upon the subject, whether true or false, from Gardner.

The law applicable to this branch of the case seems to me to be exceedingly well stated in Schouler on Wills, section 238:

"If the disposition appears on the whole a just and reasonable one, or even such as the testator would naturally have made under all the circumstances with a due perception of the act engaged in, the property possessed and the fit claimants to his bounty, little remains to urge against the will unless it can be positively shown that the will notwithstanding was not that of of the testator."

And I venture to add the following—that where a satisfactory reason is given by a testator for a change in his will, the law will not presume that the change was produced by undue influence upon the part of another, even though such person be solely benefited thereby, but there must be absolute proof to establish the charge.

In conclusion I am satisfied that the deceased intended that the property which he had accumulated by so many years of patient toil, industry and economy, should be received and enjoyed by his foster son, who was the principal beneficiary in his former will, drawn beyond question when he was competent

to make one. That his legacies to his other relatives, except Hiram Taylor, were regarded by him as of comparatively slight importance, and their reduction in amount under the circumstances of this case, does not warrant the presumption of fraud or improper influence. That the legacy to Hiram Taylor was omitted for the reason stated by testator, and there is no evidence that the charge was untrue or that it emanated from George P. Gardner. And finally, I am satisfied that to set aside this will and scatter this property among the twenty odd nephews, nieces, grand-nephews and grand-nieces of the testator, many of whom were not named in either of his wills, and to deprive George P. Gardner of the estate which the testator had in both wills planned to give him, would be a gross wrong both upon the living and upon the dead.

Let proper findings be made, and a decree entered accordingly.