Fox and others vs. Martin.

Fox and others, Respondents, vs. MARTIN, Appellant.

*November 7 — November 24, 1899.*

*Instructions to jury: Special verdict: Wills: Undue influence: Confidential relation: Secrecy as badge of fraud.*

1. It is the better practice in submitting questions to a jury to confine the instructions to such a statement of the law as to each question as is called for by the evidence and necessary to enable the jury to answer it intelligently. The contrary course is *held* to have led, in this case, to advisory findings by the jury (which the court adopted) upon probabilities suggested in the charge but not arising from the evidence.

2. Probate of a will was contested by testator's children on the ground that its execution was procured by the undue influence of his sister

Fox and others vs. Martin.

and brother-in-law, to whom, with others of his sisters and brothers, it gave equal shares with the children in his estate. A finding that the will was so procured is *held* not to be sustained by the evidence, which, among other things, negatives the existence of confidential relations between the testator and said sister and brother-in-law, wholly fails to˙ show that they prejudiced him against his children or solicited or procured the making of a will favorable to themselves, or that the will was made in secret and other relatives excluded, and shows that, under all the circumstances, the testator's disposition of his property was perfectly natural, and that the will was his free, voluntary, and intelligent act.

3. Secrecy in the making of a will is not a badge of fraud unless the circumstances are such as to suggest need of protection for the testator in order that he may express his own will instead of the will of some other person.

APPEAL from a judgment of the circuit court for Waukesha county: JAMES J. DICK, Circuit Judge. *Reversed.*

The appeal is from a judgment of the circuit court reversing a judgment of the county court of Waukesha county, respecting the validity of the will of Warren H. Stickney, and decreeing such will void on the ground of undue influence. Mr. Stickney was possessed. of a small amount of personal.property, a farm consisting of 190 acres in Waukesha county, and a tract of land in Dunn county, the latter supposed, from the consideration named in the deed, to have been worth about $900. He had three children, all adults,— two sons, *Joseph Hollis Stickney* and *Percy Warren Stickney,* and a widowed daughter, *Ellen A. Fox,* who had two children and was in very poor circumstances. The testator had eight brothers and sisters. Before making his will he made a deed and left it in possession of the person who drew it, conveying the Dunn county land to his son *Hollis.* He also made a bill of sale, conveying to *Everett Martin,* a brother-in-law at whose home he lay sick, his personal property. He willed his homestead to his three children, his brother-in-law *Martin,* and five of his brothers and sisters, including Mrs. Martin, in equal shares. Elva J. Nicolai, a sister living

a short distance from the home of the Martins, Volney J. Stickney, a brother, and Alice M. Fraser, a sister, all living near, were not remembered by the testator in his will. On the trial the foregoing facts appeared, and the following, upon which the contestants rely to establish their claim that *Everett Martin* and wife unduly influenced the testator to make the will as he did:

None of the testator's children or his brothers and sisters, outside of the *Martin* home, were notified of the making of the will so they could be present. *Martin* and his wife were present and were remembered to a much greater extent than the other relatives. The testator made statements during the later years of his life that he intended that his children should have his property. There was evidence tending to show that Mrs. Martin did not like the daughter *Ellen*, and had advised the testator, while *Ellen* and her children were living with him, to get rid of her if he could not get along otherwise. There was also evidence tending to show that when the daughter called to see her father after the will was drawn, Mrs. Martin told her that he was not in a condition to be seen. *Mr. Martin*, by direction of Stickney, procured the presence of Thomas F. Bayley for the purpose of preparing some papers for Stickney. Stickney was fifty-seven years of age at the time of his death. He was divorced from his wife about 1885, the custody of his three children being awarded to the wife, with whom they resided most of the time thereafter. After the divorce the testator lived for about two years with his father and sister Ida (who afterwards became the wife of *Everett Martin*), on the father's homestead in Waukesha county, Wisconsin. He then, under a deed from his father, took possession of the land devised by his will, and resided thereon alone till 1897. In the meantime his father died. In 1897 he induced his daughter *Ellen* and son *Hollis* to live with him, because of the fact that he was becoming too feeble to work his farm and get

along alone, though he was at that time able to do considerable work. In March, 1898, he required his children to go away because he could not bear the presence and noise of the daughter's children. He lived alone on his farm thereafter till July 31, 1898. On that day he went to the home of the Martins for a visit. He was accustomed to make such visits and to take his washing to his sister to be done. At this time the testator, though able to do considerable work and all his business, was enfeebled physically by rheumatism caused by an old injury to his knee, and some other complaints. He walked by the use of a cane, and sometimes two canes. Soon after he arrived at the Martins on the date stated, he was taken quite ill. The next day he was worse, and, quite early, he sent *Martin* to procure Bayley to draw some papers for him. Bayley lived some three miles away. On the journey to procure Bayley, *Martin* stopped at Mr. Nicolai's, a brother-in-law of Mr. Stickney, with whom his son *Hollis* resided. *Martin* left word at Nicolai's that Stickney was dangerously ill and wanted Nicolai to come and settle for some potatoes for which he was indebted. . There was some dispute in the evidence as to whether *Martin* inquired for *Hollis* or left word specially for him.

Mr. Bayley arrived at *Martin's* place about 9 o'clock of the day mentioned and before seeing Stickney requested *Martin* to find out about the papers that were to be drawn. *Martin* then interviewed Stickney and thereafter gave instructions for a deed to be drawn conveying the Dunn county land to *Hollis*, but said nothing about a will. Bayley, after drawing the deed, conversed with Mr. Stickney about the will, no one being present but the two. After receiving Stickney's instructions he drew the will and read it over to him, no one else being present, and the testator expressed his satisfaction with its provisions. *Martin* and Charles Haese were then called in and the will was executed, the former knowing nothing about its contents. Mr. Stickney

sat up in bed, getting to that position without help. *Martin*
sat behind him so that he could steady his body by leaning
back, and then, with a piece of board on his lap and the
draft of the will on the board, he wrote his name to the
paper. He then lay down and the piece of board was placed
on the side of the bed, and, using that as a rest for the will,.
Charles Haese and Mr. Bayley, at the testator's request,
signed as witnesses, each in turn kneeling down at the bed-
side when writing his signature. In the position they occu-
pied when writing their names the testator could not see
them write, which caused him to remark: "I suppose you
are signing, but I could not swear what you are doing,"
whereupon Mr. Bayley told him that it was not necessary
that he should be able to swear to that fact; that it was suf-
ficient that the witnesses were able to swear that they signed
the will as witnesses in his presence. *Mr. Martin*, after con-
sultation with Mr. Stickney, paid for drawing the papers,.
and told Bayley to keep the will. Mr. Nicolai, in response
to the request to come over and settle for the potatoes, hap-
pened in during the time the papers were being drawn, and
made such settlement, doing the business with *Mr. Martin*.
Nothing was said to him about the will. The son *Hollis*
visited his father in the afternoon, but was not told about
the execution of the papers referred to. No directions were
given by Stickney as to what to do with the bill of sale or
the deed. *Martin* took the former and Bayley kept the lat-
ter to perfect it for record by affixing thereto a revenue stamp,
and to then deliver it to *Hollis*, which he did, after some
delay on account of difficulty in procuring the stamp, but
·not till after Stickney's death, which occurred the eighth
day after the papers were made. Stickney was a very ec-
centric man, who had his own peculiar notions and carried
them out, customarily, in his own way. He was of sound
disposing mind and memory when he made the will.

The court, added to some advisory findings by the jury,

found as facts that Mr. Stickney executed the will with full knowledge of its provisions, and was of sound mind and testamentary capacity; but that he was very ill, suffering from pain, and that the will was not his free and voluntary act, but an act performed by him under undue influence exerted upon his mind by *Everett Martin* and his wife to obtain special benefits to themselves to the detriment of the testator's children. Judgment was rendered accordingly.

For the appellant there was a brief by *Tullar & Lockney*, and oral argument by *Henry Lockney*.

For the respondents there was a brief by *Ryan & Merton*, and oral argument by *E. Merton*. On the subject of undue influence they cited *Disch v. Timm*, 101 Wis. 191; *In re Derse's Will*, 103 Wis. 108; *Marx v. McGlynn*, 88 N. Y. 357; *Hartman v. Strickler*, 82 Va. 237; *Porter v. Throop*, 47 Mich. 324; *Rivard v. Rivard*, 109 Mich. 98.

MARSHALL, J. Is the finding of fact that the will was procured by undue influence, and for the benefit of *Everett* and Ida F. Martin, supported by the evidence? An answer to that is conclusive of this appeal.

The challenged finding, as indicated in the statement of facts, was primarily made by a jury. It became the decision upon which the judgment rests by adoption by the trial court. A careful reading of the evidence fails to disclose the foundation for it, keeping in mind that reasonable probabilities arising from such evidence, excluding mere speculation and conjecture, must govern. Looking elsewhere than to the evidence for a solution of the inquiry as to where the jury went for the inference embodied in their verdict, the instructions given by the trial court seem to furnish a key to the situation. They cover some twenty-four printed pages, about half as much as the entire evidence in the case. On the particular question under consideration they are quite exhaustive, referring to almost

Fox and others vs. Martin.

every circumstance said in the books to be evidentiary of undue influence. In that regard the instructions indicate much learning and industry, but as a clear, concise statement of the law applicable to the particular question which the jury were called upon to decide on the evidence they are very misleading. It is the better practice, in submitting questions to a jury, to observe the rule that instructions should be confined to such a statement of the law as to each question as is called for by the evidence and necessary to enable the jury to answer it intelligently. A long, argumentative discussion of principles, full of suggestions as to evidentiary facts, pointing to their probable existence, though there be no evidence to support that view, is quite likely to result in a miscarriage of justice, especially where the situation of the parties is such as to stimulate sympathy for the one and prejudice against the other. In such circumstances juries will easily reach a conclusion that suggested probabilities in favor of the weaker party exist and are of sufficient probative power to warrant a finding of the existence of the ultimate fact in issue, when, if pains were taken to fence their deliberations securely within the limits of the evidence produced, and to submit to them only questions in regard to which there are reasonably conflicting inferences from such evidence, and to give to the jury the law applicable thereto and none other, the result would rarely be other in fact than in theory,— the safest and most just test of where the truth lies. The mischief of a contrary course is rarely better illustrated than in this case. It not only led, as it seems, to a finding of fact upon suggested probabilities not arising from evidence produced, but the trial judge adopted the result as his deliberate conclusion, and rendered judgment thereon.

The suggestions referred to, not warranted by the evidence, in the main are: (1) The existence of confidential relations between the testator and the Martins; (2) creation of

prejudice by the Martins in the mind of Mr. Stickney against his children; (3) the Martins were guilty of solicitation and procuration in regard to securing a will favorable to them, and were particularly active in that regard; (4) the testator made an unnatural disposition of his property; (5) the will was made in secret, the Martins being instrumental in excluding the testator's children and other relatives from his presence, instead of notifying them that a will was to be made so they might be present and protect their interests.

On the subject of confidential relations, the evidence is without dispute that Mr. Stickney was a man who did not have confidential relations with any one; that he was exceptionally a self-willed man down to and inclusive of the time when the will was made; that he did his own thinking, came to conclusions by his own peculiar processes of reasoning, and, on the occasion in question, he expressed fully the reasons for his conduct, as will be more fully stated hereafter. He was a very peculiar and eccentric man. He had lived alone for many years prior to the time he was taken sick, except a short period of very unsatisfactory association with two of his children, particularly with his daughter *Ellen.* He was at the *Martin* home when the will was made without solicitation or influence on their part. He was unexpectedly taken sick while making an ordinary visit to his sister, where it was more natural to go than elsewhere, as the Martins lived on the old Stickney homestead where he had spent much of his life and where his sister Ida had been his associate more recently than any other living member of the Stickney family. Soon after he was taken sick, realizing that the sickness was liable to be serious, he sent *Mr. Martin* to obtain the presence of Mr. Bayley to draw some papers for him, and of his brother-in-law, Nicolai, to settle a business transaction respecting some potatoes. When Bayley arrived *Mr. Martin* received the sick man's directions as to the deed to be made to *Hollis* and reported the same to

the former. It does not appear that he gave any directions whatever regarding the bill of sale. For aught that appears that was the result of a conversation between Mr. Stickney and Mr. Bayley. When Nicolai arrived to settle for the potatoes *Mr. Martin* received the money to avoid disturbing Mr. Stickney, as he was in some pain and evidently engrossed with the business in hand of having his papers drawn by Bayley. It will be seen that the Martins were not in any position of confidence with Mr. Stickney, which they could have abused for their own advantage. The situation cannot properly be called one of confidential relations, precluding an occurrence for the benefit of one to the detriment of others without the former being responsible for showing that his conduct was free from fraud.

On the subject of prejudicing Mr. Stickney against his children evidence is entirely wanting. True, Mrs. Martin told her brother that if he could not get along with his daughter *Ellen* she would advise sending her away; further, she did not encourage the presence of the daughter when Mr. Stickney was sick, but the state of mind of the father and daughter explains that and shows that Mrs. Martin was in no way responsible for it. Stickney endeavored to live with his daughter and her children, but they annoyed him so intensely that he felt obliged to secure peace of mind by sending them away. Mr. Nicolai, an unfriendly witness, testified that he knew in advance that Mr. Stickney would not be able to live with his daughter and her children and advised strongly against attempting it. After the daughter was sent away she did not visit her father or pay any attention to him till he was on his deathbed. All the indications are that he did not then care to see her. Mrs. Martin, after communicating with him, told the daughter that he was not in a condition to be seen. He did not inquire for her after that, and she did not visit him, even to inquire, till the night he died, though he needed attention night and day for a

period of some eight days, and he had ample opportunity to express his wishes as to her to his son *Hollis*. The son went to his father's bedside on the day the will was drawn and was there much of the time afterwards till death occurred. He had ample opportunity to communicate with his father about the will and to know his father's wishes as to *Ellen* without any interference whatever from the Martins. The other son was in Missouri. Mr. Stickney had seen but little of any of the children since they were quite young, and evidently had no warmth of affection for any except *Hollis*. After the will was drawn he said that *Hollis* was a nice boy and he had provided for him so as to give him a good start; that it made little difference what he gave the other children, because they would not be satisfied till it was all wasted. That shows clearly the state of Mr. Stickney's mind, as it was privately made known to the man who drew the will, uninfluenced by anybody. Such condition of mind seems quite natural in view of the eccentric character of the man and his history as shown by the uncontroverted evidence. Much significance is given to the fact that the daughter was obliged to take in washing and do other hard service to support herself and children; but it appears that Mr. Stickney wanted her to go to some other part of the country, and that her remaining in the neighborhood, working as she did, under the circumstances, tended to annoy him. He considered that she thereby wilfully brought discredit upon him among his neighbors, as it seems.

On the subject of unnatural disposition of the property, sufficient has already been said to show that the will in that regard was made exactly in accordance with the bent of the testator's mind. He was a man of strong prejudices and was eccentric to a high degree. He remembered his children as he viewed their deserts, and then gave some of his property to such of his brothers and sisters as he desired to remember in that way, providing more particularly for

his sister Ida and her husband than for any of the others, which is readily explained by the fact that such sister stood nearest to him in family regard. As before indicated, she lived on the old homestead and to her he felt more free to turn than to the others, as is evidenced by the fact that he had customarily taken his washing to her home to be done and had been accustomed to visit her frequently. On the whole, considering the mental characteristics of the testator and the relations he sustained to his relatives, the disposition of his property was perfectly natural and intelligent.

On the subject of solicitation and procurement to secure the making of a will favorable to the Martins, we fail to find any circumstance to create a suspicion. It does not even appear, definitely, that *Mr. Martin*, when he went on the errand to secure the presence of Mr. Bayley, was aware a will was to be drawn. It affirmatively appears that all the directions as to how the property was to be disposed of in the will were given by Mr. Stickney privately to his scrivener, that the will was approved by him when drawn, such approval being accompanied by statements explanatory of his conduct, that he was very decided as to all he wanted done, and was so thoughtful throughout that when the witnesses came to sign he called Mr. Bayley's attention to the fact that he was not in position to see their signatures as they were writing, and had to be assured that it was sufficient if the witnesses actually signed in his presence. From first to last *Mr. Martin* was not consulted as to how the will should be drawn, did not know its contents till it was read in probate court, and did not make any inquiries of Mr. Bayley as to its contents. His conduct throughout appears to have been free from criticism.

On the subject of the will being made in secret, and the other relatives being excluded instead of being called in so as to protect their interests, there is the same lack of evi-

dence as in respect to the other circumstances mentioned. Reasonable efforts were made to notify the son *Hollis* and Mr. Nicolai of the illness of Mr. Stickney. The other relatives heard of the illness in due time and visited and conversed with the sick man freely, when, as they testified, he was in the full possession of his faculties and conversed as usual. Inasmuch as the will was made without solicitation or influence on the part of the Martins, and they were ignorant of its contents, and there was no question but that Stickney was perfect master of himself in doing as he liked, there was no occasion for any one to be called in to protect him against the Martins, or for their protection against suspicion of wrongdoing in the event of the will being favorable to them. There is liable to be far too much significance given to the circumstance of a person making his will in private. It would be a strange doctrine to adopt, that a person, in making his will, for safety against its being impeached for fraud, must call in his relatives or neighbors. Of all the things that a person about to make a final disposition of his property would think of, if in the full possession of his faculties, that is not one. Men usually make their wills in private and try to keep their provisions profoundly secret so long as they live. The circumstance that a will is thus made is not of itself suspicious in the absence of proof that the mind of the testator was weak and susceptible to undue influence. The presence of others than the favored beneficiary is not for the purpose of consultation with the testator, but to exclude the idea that may otherwise exist, that one was favored because of his solicitation or procuration or other improper influence. The idea that, as a rule, relatives must be called in when a person is about to make his will, is out of harmony with the testamentary right, and contrary to reason and common sense. The adjudications referring to the making of a will in secret as a badge of fraud have no application to situations where the circumstances

Fox and others vs. Martin.

are not such as to suggest need of protection for the testator in order that he may express his will instead of the will of some other person. To refer to the perfectly natural circumstance of a person making a will in private as a badge of fraud, where there is no reason for publicity to insure protection to the testator from those standing near to him, and security to them against the charge of procuring the will for selfish purposes, is not justified by the law and tends to destroy the testamentary right.

No further discussion of the evidence seems to be necessary. The learned court misled the jury by the nature of the charge, and then adopted their finding and passed judgment as before indicated. The instructions led the jury away from the evidence into the realms of conjecture and speculation, and even worse, as it suggested the probability of the existence of evidentiary circumstances of fraud where the evidence shows conclusively that the will was the free, intelligent act of the testator. It seems to have been forgotten that, where the circumstances, to which the court referred as evidentiary of undue influence, exist, calling for explanation, their effect is entirely destroyed by affirmative proof that the will was the free and intelligent act of the testator.

A brief reference to the cases decided by this court will emphasize what has been said, particularly on the question of the significance of want of publicity in the making of a will and the circumstances under which that tends to raise an inference of undue influence. In *Watkins v. Brant*, 46 Wis. 419, the validity of a deed was questioned. The grantor, a weak-minded, partially deaf married woman, entirely unacquainted with business matters, possessed of eighty acres of land, all the property of the family, was secretly induced to convey part of it to a strong-minded, energetic sister without consideration or knowledge of her husband. The grantee worked upon the grantor's mind by interviews and

Fox and others vs. Martin.

solicitations, continued for a considerable period of time, pledging the latter, during such time, not to talk with her husband about the matter. Finally the grantee, by aid of her mother, induced the grantor to go to an attorney's office and sign a deed for sixty acres of land, believing it was a deed for twenty acres.

In *Davis v. Dean*, 66 Wis. 100, the validity of a deed was in question. The grantor was a woman eighty years of age and was incompetent to do business. She had been unconscious, or partially so, for some days before the paper was made, and was in that condition most of the time afterwards till she died. She conveyed all her property to a man not her son, but whom she and her husband had reared and educated, disinheriting her daughter and several families of grandchildren. The time of the transaction was between 9 o'clock in the evening and midnight. The grantee knew beforehand what was to be done, and planned, therefore, to secure absolute secrecy from the other relatives, by selecting night-time for the transaction, procuring the presence of a justice of the peace and the doctor, and inducing two grandsons, who expected to sit up with their grandmother that night, to go home.

In *Cole v. Getzinger*, 96 Wis. 559, the victim of undue influence was an old man, eighty-eight years of age, too infirm in mind and body to intelligently attend to business matters of importance without assistance. The only persons concerned in obtaining the deed, or who had knowledge of it, were beneficiaries, two of whom, however, a daughter and son-in-law, pretended to be acting in the interest of the grantor.

In *Baker v. Baker*, 102 Wis. 226, the testator was seventy-three years of age, so weak mentally as to be easily influenced by his wife, who practically dictated his will, leaving to her nearly all of his property.

In *In re Derse's Will*, 103 Wis. 108, the testatrix was an

old lady, seventy-three years of age, who had suffered two
strokes of paralysis and was helpless and irresponsible.
There was no question but that her mind was greatly im-
paired when she made the will. She had twelve children.
The one son with whom she resided, by numerous acts prior
to the making of the will, exhibited a disposition to obtain
possession of his mother's property. He finally secured the
execution of a will very favorable to himself, in place of
one previously made leaving the testatrix's property to her
children share and share alike.

It will be observed that in each instance there was a sub-
ject unquestionably susceptible to undue influence, and there
was clear evidence of a disposition on the part of the fa-
vored person to exercise such influence. In such a situation
the secrecy of the transaction was said to be a significant
circumstance, evidentiary of fraud. Lay aside the two ele-
ments mentioned, and the mere circumstance of secrecy
ceases to be evidentiary of undue influence, and becomes
consistent with the usual way in which such business transac-
tions occur. In *Disch v. Timm*, 101 Wis. 179, quoting from
*In re Wheeler's Will*, 5 Misc. 279, it was said: "Where in-
terest, opportunity, and a disposition to influence a testator
improperly are shown, a presumption of undue influence
arises." It follows that where opportunity does not exist,
for want of a subject susceptible to undue influence, mere
secrecy does not create suspicion or give sufficient signifi-
cance to the other circumstances stated, standing alone, to
create a presumption of fraud. Further quoting, it is said,
in regard to the situation when the presumption of undue in-
fluence exists, "the burden is then on the party charged there-
with to show that the will was testator's voluntary act."
Here, as has been seen, the alleged fraud was not established
so as to cast upon the defendant the burden of rebutting it.
Nevertheless, the fact was established, affirmatively, that

the will of Mr. Stickney was his free, voluntary, and intelligent act.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded with directions to affirm the judgment of the probate court admitting the will to probate.