FIELD, Respondent, vs. PICKARD, Appellant (IN RE SHERWOOD'S WILL).

*October 27—November 14, 1905.*

*Wills: Mental capacity: Undue influence.*

The evidence in this case—showing, among other things, that the testator, eighty-five years old at the time of making the will, was self-willed, arbitrary, eccentric, penurious, and somewhat intemperate, and that his feelings towards his adopted daughter and his relatives were unfriendly because he thought they had no interest in him except a desire to share in his property at his death, but that he retained his mental faculties until his death about three years later, and that he managed and conducted his personal and property affairs and fully understood the kind and amount of property he had, his relationship to those who might naturally be the objects of his bounty, and the scope and effect of his will as made, which gave most of his property to his financial adviser, an officer of the bank with which he did business—is *held* to sustain findings of the trial court to the effect that the testator was mentally competent to make the will and that it was not made under undue influence.

APPEAL from a judgment of the circuit court for Fond du Lac county: JOHN GOODLAND, Judge. *Affirmed.*

This is a contest over the probate of an instrument offered as the last will of Charles L. Sherwood, deceased. The county court of Fond du Lac county refused probate of the alleged will, and thereupon *George L. Field,* who is named as executor therein, appealed to the circuit court, where it was admitted to probate. The contestant, *Mary Hannah Pickard,* is an adopted daughter of the deceased. She alleges that at the time this instrument was made and executed deceased had not sufficient mental capacity to make a will and that it was made as a result of undue influence. No contest is made as to the formal execution of the will. Charles L. Sherwood was born in 1815 and died February 18, 1903, being a little over eighty-eight years of age when he died. He came to this state in 1854 and settled on a farm about three miles from Ripon, and he resided there continuously up to the time of his death. His wife died in 1897. No children were born to them. The contestant, who had resided with them from the time she was two years of age, was adopted by them when she was eleven years old. She continued to reside and live with them after her adoption by them until she arrived at the age of twenty years, when she married. This marriage occurred in 1887 at the Methodist parsonage in the city of Ripon. Deceased and his wife, who were opposed to it, were not present. After contestant's marriage she and her husband resided in Michigan for a while, then in Northern Wisconsin, and thereafter for ten years in Tower, Minnesota, whence they removed in 1901, living in the west for some months and finally settling at Cumberland, Wisconsin, where they resided at the time of the trial in the county court. They have a boy, the issue of their marriage. The deceased left surviving him sisters and brothers, nieces and nephews. With these he did not have much intercourse during the latter part of his life, except with his sister, Mrs. Kate Lyons, who was married to his

wife's brother, and with George L. Sherwood, a nephew and only son of his brother George. The estate of the deceased consisted of a farm of 145 acres, valued at from $70 to $85 per acre, government bonds to the amount of $2,000, a certificate of deposit in the First National Bank of Ripon to the amount of $4,050, and other items of personal property of the probable value of $500. It appears that he had had this property for some time prior to his death.

On June 14, 1900, Mr. Sherwood made the alleged will, which contains the following bequests: To the rector, wardens, and vestrymen of St. Peter's Protestant Episcopal Church of Ripon, $500; to *Mary Hannah Pickard,* $1,000; to Mrs. George L. Sherwood, $300; to George L. Sherwood, $100; and all the remainder to *George L. Field* of Ripon, Wisconsin. In a prior will of July 27, 1899, the following bequests were made: (1) To *Mary Hannah Pickard,* $500; (2) to the rector, wardens, and vestrymen of St. Peter's Protestant Episcopal Church of Ripon, $500; (3) to Mrs. George L. Sherwood, $500; (4) all the residue of the estate to *George L. Field,* subject to an annuity of three per cent. per annum to be paid to George L. Sherwood during his natural life. On September 27, 1899, he revoked the legacy to Mrs. George L. Sherwood and bequeathed that sum to George L. Sherwood. It appears that for years before his death the deceased did his banking business at the First National Bank of Ripon, of which *Mr. Field* had been, and was at the time of the execution of the will, an officer. *Mr. Field* had been the deceased's financial adviser for a considerable time prior to his death. The deceased and his wife were displeased with the contestant because of her marriage with Mr. Pickard. Though she and her husband and child visited at his home up to the time of his death, the friendly relations common to parent and child did not exist, nor did he manifest a parent's interest in her welfare, nor did she at the time of her visits to his home and the neighborhood show that she was solicitous concerning his

having proper assistance under the conditions that beset him as the result of old age. It is quite apparent that there was no strong feeling of esteem and regard between them, and that deceased had become quite estranged from her in the latter years of his life. He also had but little interest in his brothers and sisters and their children. Of these he was most intimate and friendly with his sister Mrs. Kate Lyons, and his nephew George L. Sherwood. Though friendly to this sister he harbored a strong dislike for her husband, and before his death he expressed an unwillingness for this reason to bequeath her anything. It appears that his nephew George L. Sherwood came to the home of the deceased in September, 1899, with the approval of the deceased. It was intended that this nephew should reside with the deceased and assist him in his personal and household affairs. This arrangement continued until the following April, when by reason of differences between them they separated and the nephew left decedent's home. Thereafter this nephew did not again live with him, though he at times called at the house. From this time the deceased lived practically alone and without assistance, except such as he arranged for with his tenant for the preparation of his meals and for aid in his household affairs. The evidence shows that Mr. Sherwood conducted his business and personally managed his property during his lifetime, except that he had tenants on his farm for some years before his death. He contracted with them, fixed the terms of the lease, and consulted and advised with them as to seeding and planting the crops and the general conduct of the farming business. He always attended to receiving his share of the crops and of the increase of the stock, or their avails in case of sale. He retained to the last an independent, self-reliant position as to all his business and property affairs. In temperament and disposition he was self-willed, eccentric, and assertive of his personal views and opinions. He never affiliated with any church, and no explanation, so far as appears, was ever made

by him concerning his bequest to the church.    Prior to his wife's death he appears not to have been addicted to the excessive use of intoxicating liquors.    After her decease his habit of indulgence in intoxicants increased to some extent, and at times he drank to excess.    During the last years of his life he declared that his relatives were unmindful of him and that he purposed not to leave any of his property to them.

So far as disclosed the deceased decided for himself as to the making of both of the wills of 1899 and 1900 and determined when and how and by whom they should be drawn. There is nothing to show but that he was in possession of a complete understanding of his situation and that he comprehended the nature of his business.    It is shown that he gave the directions for the bequests he wished to make, and that they were written as he directed.    In September following the making of the first will, while his nephew George L. Sherwood was with him and they were on friendly relations, he went to the bank, made known to those who had custody of this will that he wished to change a bequest by revoking the one to Mrs. George L. Sherwood and by bestowing it on George L. Sherwood, his nephew, and a codicil to effect this change was added and executed, and the will was again left in the custody of the bank.    In June of the following year, after the difficulty between himself and his nephew had arisen, he came to the bank alone, and, so far as appears, without the advice of any person, announced his intention to change some of the provisions of the will.    For this purpose he and Mr. Spratt, cashier of the bank, retired to a room alone, where the provisions of the old will were read to him by Mr. Spratt, and he directed the changes in the bequests to the contestant and to George L. Sherwood, and directed that Mrs. Sherwood be again included by a bequest of $300.    After its completion as directed, the witnesses, Mary E. Scribner and T. B. Dakin, were called into the room, when the attestation clause was read to him and to them by Mr. Spratt; thereupon the de-

ceased stated that it was his will, signed it in their presence,. and they signed as witnesses in his presence. The witnesses give it as their opinion that the deceased acted freely and seemed to understand and comprehend what he was doing.. At this time deceased's health was somewhat impaired, but he had not been confined to his house or bed except for a short period in June, 1899. He controlled and managed his per- sonal and household affairs up to within a short period of his death. There was much nonexpert testimony adduced by both parties as to deceased's mental capacity to make a will. The witnesses were in direct conflict on this question.

For the appellant there was a brief by *Giffin & Sutherland,.* and oral argument by *D. D. Sutherland.*

For the respondent there was a brief by *L. E. & Roy Reed,.* attorneys, and *A. E. Thompson* and *Charles Barber,* of coun- sel, and oral argument by *Mr. Barber* and *Mr. Thompson.*

SIEBECKER, J. The judgment admitting to probate the in- strument alleged to be the last will of Charles L. Sherwood is based upon the findings of the court that he was mentally competent to make the proposed will and that he made it free from undue influence. These findings are challenged by the contestant. The facts shown by the evidence upon these con- tested questions are given in the foregoing statement of facts. From this it appears that Mr. Sherwood was eighty-five years of age when he executed this instrument, and he was then re- siding on his farm which he had conducted for almost fifty years. Though he was then unable to perform the active part of the labor, yet he conducted it and managed its affairs through tenants to the time of his death. He also controlled his financial affairs and personally attended to his expendi- tures and receipts.

It is clearly established that his characteristics were those of a self-willed, arbitrary, and eccentric person, who resented interference from others in his business or personal matters..

He manifested a disposition to be positive and unyielding in his opinions. In the latter years of his life he became parsimonious to such a degree as led him to deny himself many things necessary for his proper care and comfort. This appears clearly to be attributable to his avariciousness and in no way shows unsoundness of mind. Nor do we find that any intemperate indulgence in ardent spirits permanently affected his mind or seriously interfered with his capacity to conduct his business. His feeling and attitude of mind toward his adopted daughter and his relatives were manifestly those of ill-will and displeasure, evidently due to an idea entertained by him that they had no interest in him, save that which came from the desire to become the objects of his bounty under the provisions of his will. His friendly and hostile feelings toward his nephew George L. Sherwood correspond closely to the favorable and unfavorable provisions he inserted in his two wills as to him, and argue that he was moved to make them upon consideration and for reasons which to him undoubtedly appeared all-sufficient under the circumstances.

Much stress is laid upon the evidence of nonexperts to the effect that Mr. Sherwood was incapable of conducting his own business or of making a will. An examination of this evidence discloses that the witnesses relied mainly on acts and conversations showing his mental eccentricities, his penurious conduct, his intemperate habits, and what they considered unfounded prejudices toward those naturally closest to him. All these acts and conditions are readily explainable under the facts and circumstances as compatible with mental soundness. Whether or not he reasoned and dealt justly under the circumstances with those nearest to him through family relationship does not determine his capacity to make a will. The proof practically tends to sustain every inference to the effect that the deceased was in possession of his mental faculties to the last; that he comprehended and fully understood the kind and amount of property he possessed and owned;

that he managed and conducted his personal and property affairs, understanding and fully comprehending his relationship to those who might properly be regarded as his beneficiaries; and that he understood and comprehended the scope and bearing of his will and the disposition of his property as made by him. He seems to have held all these things sufficiently clear in his mind to understand their obvious relation and form a rational judgment on the whole transaction.

The claim that this instrument was made as the result of undue influence is based upon the ground that his mind was seriously enfeebled, his memory weakened, and that it was made when no one was present beside the principal, beneficiary and his clerks and servants, who had no claim upon his bounty, and that it runs counter to his recognized affections and prejudices and declared testamentary purposes as well as the rules of natural justice. His condition of mind and memory, his relationship to those naturally within the field of his bounty, and his testamentary purposes have been sufficiently adverted to to show that the proposed will is not in conflict therewith. Nor is the argument that the bequests run counter to natural justice persuasive, in view of the situation before us. The question is not what would have been theoretically the most just or reasonable way for him to have bequeathed his property, but was "he . . . impelled . . . by undue influence to make a different will from what he would have made if he had been left entirely alone and free to act according to his own judgment and discretion"? Underhill, Wills, 180. The inference is well nigh irresistible that the deceased entertained a very strong desire to bestow the accumulation of his life so as to preserve it from becoming dissipated in inconsiderate and thriftless ways, and that he was not favorably inclined to devote it to purposes of any public benefaction. Under such circumstances, since he was disinclined to bestow it on members of his family, there was but the one way open to him, namely, to bequeath it to some person whom he be-

lieved worthy to be endowed therewith. Considering the facts attending the making and execution of this instrument in the light of the whole situation, we are of the opinion that no facts have been adduced but such as harmonize with the conclusion that the deceased was left entirely free to act according to his own judgment and discretion.

There is nothing in the evidence which will warrant this court in disturbing the conclusion of the trial court upon the contested questions. The following cases in this court cover the questions involved here: *Fox v. Martin,* 104 Wis. 581, 80 N. W. 921; *In re Butler's Will,* 110 Wis. 70, 85 N. W. 678; *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939. This result is reached without considering the evidence of *Mr. Field,* which was objected to by the contestant.

Error is assigned upon the allowance of proponent's attorney's fees to be paid out of the estate. Since the contestant cannot be affected by this ruling, and this burden must fall upon the residuary legatee, who is also the proponent in whose favor the allowance was made, it is unnecessary to consider this question.

*By the Court.*—The judgment of the circuit court is affirmed.