CITIZENS' LOAN & TRUST COMPANY, Administrator, Appellant, vs. HOLMES, Respondent.
SAME, Respondent, vs. SAME, Appellant.

*December 3, 1902—January 13, 1903.*

*Equity: Deed of gift: Mental capacity: Undue influence: Evidence: Immaterial error: Assets of decedent's estate.*

1. In an action to set aside a deed of gift, the evidence (stated in the opinion) is *held* to sustain findings of mental capacity in the donor, although at the time of the gift the donor was suffering from paralysis, and died about two months later.

2. In such case the evidence is *held* to sustain findings of absence of undue influence exerted on the donor, although by direction

of the donor, assented to by the donee, the donee made suspiciously large payments for services to persons who became her witnesses, and, shortly after donor's death, the donee made large payments to the donor's heirs and took releases from them.

3. In an equitable action to set aside a deed of gift on the ground of want of mental capacity and undue influence, the admission of incompetent evidence in behalf of defendant is immaterial error, where findings favorable to her are supported by competent evidence.

4. A decedent, absent from home at a hotel, was taken sick and sent for defendant, to whom he executed a deed of gift of practically all his estate. Before defendant arrived, decedent gave a sum of money to the hotel keeper for safe keeping. The hotel keeper deposited it in a bank in defendant's name, and it was all drawn out by her under decedent's instructions, and used to pay expenses. *Held*, that no portion of that money belonged to decedent's estate, and defendant was not liable therefor to decedent's administrator.

APPEALS from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Reversed in part.*

This action was commenced January 4, 1901, to set aside a deed of gift and order alleged to have been executed by the plaintiff's intestate December 7, 1899, to the defendant, of $166,258 in United States bonds and certificates of deposit then held for safe-keeping by John Johnston, cashier of the Wisconsin Marine & Fire Insurance Company Bank, at Milwaukee, on the ground that such deed of gift and order had been procured by the defendant by fraud and undue influence, and at a time when the deceased was mentally incompetent to do business. The defendant answered by way of admissions, denials, and counter allegations, and, among other things, alleged, in effect, that after the death of the said Charles James, January 31, 1900, and after the defendant came into the possession of the property mentioned, she gave to each of the several heirs at law of said deceased mentioned in the complaint large sums of money received by her from the deceased, and that each of them accepted the

same and executed to her a release and discharge of the defendant from any and all liability on account of her relationship to the deceased. The cause having been reached for trial, the plaintiff moved the court to have certain issues of fact submitted to a jury for determination, and the motion was granted; and the court thereupon ordered the following questions to be submitted to the jury, which was then impaneled and sworn:

First question: "Was the said Charles James, at the time of the executing of the alleged deed of gift, possessed of sufficient mental capacity to know and understand the business in which he was then engaged?" Second question: "Did the said Charles James execute the alleged deed of gift because of undue influence or coercion exercised by others, and which deprived him of his free will?"

Afterwards at the close of all the testimony the court withdrew the case from the jury, and answered the first question in the affirmative, and the second question in the negative; that is to say, the court found, in effect, that at the time of executing the deed of gift the said Charles James was possessed of sufficient mental capacity to know and understand the business in which he was then engaged, and that the said Charles James did not execute the alleged deed of gift because of undue influence or coercion exercised by others, and which deprived him of his free will.

The court also found, as matters of fact, in effect: (1) That the plaintiff is a corporation authorized to act as such administrator. (2) That the defendant, *Millicent Holmes,* resides in Mineral Point, Wisconsin, and is a grandniece of the deceased. (3) That Charles James was a citizen and resident of Milwaukee, and died in the city of Thomasville, Georgia, January 31, 1900, without leaving any last will and testament, unmarried, leaving no parents, brothers or sisters, or issue; his nearest relatives being nieces and nephews and grandnephews and grandnieces. (4) That July 11, 1900, letters of administration upon the estate of the de-

ceased were duly issued to the plaintiff; that the plaintiff thereupon, and before the commencement of this action, duly qualified and entered upon its duties as such administrator, and has continued as such ever since. (5) That December 7, 1899, the deceased was the owner of money, certificates of deposit, and United States bonds to the amount and value of $166,258. (6) That at no time during the life of the said Charles James, prior to and including December 7, 1899, was the said Charles James feeble in mind or unable to manage his affairs and property, but, on the contrary, down to and including December 7, 1899, and for at least three weeks thereafter, the said Charles James was of sound mind, and able to manage his affairs and property. (7) That down to December 2, 1899, the said Charles James was a man unusually vigorous, physically, for one of his age (he being of the age of eighty-eight years), and was a man of strong will. (8) That December 2, 1899, at a hotel in Thomasville, the said Charles James suffered a stroke of paralysis, which affected the left side of his body; that such stroke of paralysis in no manner whatever impaired the mental faculties of the said Charles James; that such sickness was the only sickness from which the said Charles James at that time suffered; and that January 31, 1900, he died, never having in the meantime recovered from said sickness. (9) That the said deceased had no relatives with him at the time he became sick as aforesaid. Realizing his position, he called upon Royal J. Miller, the proprietor of the hotel at which he was stopping, and directed him to send a telegram to the defendant, at Mineral Point, to come to him at once, and bring her brother, and at the same time delivered to the said Miller the currency which he had with him, amounting to the sum of about $700, to retain the same for safe-keeping, and directed the said Miller to send a telegram to John Johnston, cashier of the Wisconsin Marine & Fire Insurance Company Bank, to send the money that he had on deposit (about $2,600) by

New York draft, payable to the order of the defendant, and gave to the said Miller a receipt which he had from the said Johnston as custodian of his property, accompanying the delivery of the receipt to Miller with a statement that he wished to transfer all of the property described in the receipt to *Miss Millicent Holmes,* of Mineral Point, and with the request that he would see that the proper instrument or instruments conveying such property was prepared. The said receipt is as follows:

"Milwaukee, Nov. 3, 1899.

"Charles James, Esq., City—*Dear Sir:* I have this day received from you, for safe-keeping and the collection of interest thereon:

| | | |
|---|---|---:|
| 3% coupon bonds.................................................. | | $50,000 |
| c/d Wis. M. & F. Ins. Co. Bank, No. 110,840..................... | | 29,258 |
| do | No. 109,154..................... | 37,000 |
| do | No. 109,058..................... | 50,000 |
| | | $166,258 |

"Yours, truly,

"John Johnston."

—That the said Miller had no acquaintance with the said defendant, and had never had communication with her; that the arrangements for the transfer of said property originated with the deceased, and he gave all of the directions above set forth without suggestion from any one, and as his free and voluntary act, uninfluenced by any person. (10) That pursuant to the request by telegram of the deceased, the defendant proceeded to Thomasville, arriving there on December 6, 1899; that the defendant did not know until her arrival at Thomasville as aforesaid of the intention of the deceased to give her the said property, but that, on the evening of her arrival there, the said deceased, without solicitation on the part of the defendant, or any other person in her behalf, stated that he intended to give her all of his property, and that he had arranged for transfer thereof to her. (11) That pursuant to the direction given to the said Miller by the deceased previous to the arrival of the defendant, and of direc-

tions personally given to Hope H. Alexander, an attorney of
Thomasville, by the deceased and by the said Miller, the said
Alexander did prepare for execution, and to transfer to the
defendant the said property, the writing, Exhibit B, attached
to the complaint in this action.    (12) That December 7,
1899, the said Alexander, accompanied by the said Miller
and one James L. Pringle, went to the room where the de-
ceased then was, and exhibited to him the said contract, and
read and explained the contents thereof to him, and he then
and there stated to the said parties that the said paper ex-
pressed and carried out his intentions, and did freely and
voluntarily, without solicitation from any one, and wholly of
his own volition and with his own hand, execute said paper,
with the intention of thereby giving and transferring to the
defendant the property therein described, and the said paper,
after being witnessed by the witnesses whose names appear
thereon, in the presence of the donor, and acknowledged by
the notary public also in his presence, and after the signature
of the notary was properly attested by the certificate of the
clerk of the court, was duly delivered to the said defendant,
all with the knowledge, approval, consent, and by the direc-
tion of the said deceased.    (13) That after the execution and
delivery of the paper as aforesaid, the said Charles James did
cause to be written upon the receipt of the said John Johnston
direction to the said Johnston to deliver the property in said
receipt described to the said defendant, and duly signed such
order; that such order is in the words and figures following:

"Thomasville, Ga., December 7th, 1899.
"To John Johnston, Esq.,
    "Milwaukee, Wis.
    "*Dear Sir:* You will please pay over and deliver to *Miss
Millicent Holmes,* of Mineral Point, Iowa county, Wiscon-
sin, the United States interest-bearing bonds and coupons,
together with the three (3) certificates of deposit, mentioned
in the foregoing receipt signed by you, on demand by her.

And I further authorize and instruct you to issue or cause to be issued to her new certificates of deposit in her own name for the amounts named in the original certificate of deposit issued to me by the Wisconsin Marine & Fire Insurance Company Bank. I was stricken with paralysis, and had to do this.

"Very truly yours,
"CHARLES JAMES."
"Witnessed by
"Hope H. Alexander."

That thereafter, and by direction of the said Charles James so to do, the said defendant proceeded with said contract and order to the city of Milwaukee, presented the same to the said John Johnston, and on said 14th day of December, 1899, the said John Johnston did, pursuant to said contract and said order, deliver the property therein described to the said defendant, *Millicent Holmes;* that thereafter the said *Millicent Holmes* did return to the city of Thomasville, and remained with and cared for the said Charles James to the time of his death. (14) That after the death of the said Charles James the defendant did freely and voluntarily, without any obligation resting upon her so to do, give to the several persons named in the complaint as the only heirs at law of the deceased the sums of money following: William F. James, $10,000; Christina Holmes, $15,000; George A. James, $5,000,—and did set aside in the hands of John Johnston, trustee, the sum of $15,000 for the use of William B. James and his children; that each of said parties executed in writing acknowledgments of similar form and to the same effect as the instrument set forth in the answer; that in addition thereto the defendant did freely and voluntarily give to other relatives of the deceased, without any obligation resting upon her so to do, the sums of money as follows: Charles Edwin Holmes, $15,000; Ella M. Prisk, $5,000; George W. Holmes, $15,000; Henry Holmes, $15,000; Harry S. James, $5,000; George White, $1,000; Charles E. White,

$1,000; that each of the parties so receiving money acknowledged the receipt thereof, and that they had no claim upon the said Charles James or his estate; that none of the parties receiving such sums of money has ever returned the same, or offered to return the same or revoke the writings made by them; that there came into the hands of the defendant $642.14 belonging to the deceased, which is not included in the money given to her by the deed of gift heretofore referred to; and that said sum of $634 belongs to the estate of the said deceased, and the administrator thereof is entitled to have and recover the same from the defendant, less such costs as may be awarded to her in this action.

And as conclusions of law the court found, in effect, that by the instrument of conveyance, and by the order to the said John Johnston, and by the delivery of the property therein described to the defendant, the whole title and beneficial interest in the said property became vested in the defendant during the lifetime of the deceased, and became absolutely and unconditionally vested in the defendant, and she became the owner thereof; that by accepting the money delivered by the defendant to the heirs at law of the deceased, and executing the agreements and releases referred to, all the heirs of the deceased have acknowledged full satisfaction of any claim or demand or right they might otherwise have to any portion of the estate of the deceased, or of the property given by him to the defendant as aforesaid, and are estopped from making any claim or demand upon her, or any attack upon the title to the property so transferred to her; that the defendant is entitled to the judgment of the court dismissing the plaintiff's complaint, with her disbursements, and the plaintiff is entitled to judgment in its favor for $642.18 and interest from December 10, 1900,—and ordered judgment to be entered accordingly.

The plaintiff appeals from the whole of the judgment in favor of the defendant and against the plaintiff. The de-

fendant appeals from so much of the judgment as is in favor of the plaintiff and against the defendant for $739.12.

For the plaintiff there was a brief by *Nath. Pereles & Sons,* attorneys, and *G. D. Goff,* of counsel, and a supplemental brief signed by *Nath. Pereles & Sons,* and oral argument by *Mr. Goff.*

For the defendant there were briefs by *Turner, Pease & Turner,* and oral argument by *W. J. Turner.*

CASSODAY, C. J.   It is claimed on the part of the plaintiff that at the time of executing the deed of gift and the order upon the cashier of the bank to deliver the bonds and certificates of deposit to the defendant, December 7, 1899, the deceased was mentally incompetent to comprehend the business in which he was then engaged. The trial court, after hearing all the evidence, found to the contrary; and the question is whether such finding is against the clear preponderance of the evidence.   The evidence bearing upon that question was almost wholly from witnesses produced on the part of the defendant, who had known the deceased for many years, including the cashier of the bank with whom he had done business for many years.   From the testimony of such witnesses, there can be no question but that the deceased, prior to his starting for Thomasville, Georgia, on or about November 4, 1899, was of sound mind and memory, and perfectly competent to transact any business.   He had for many years been a resident of Milwaukee county, and by economy, thrift, and judicious investments, and the increase in the value of property, had accumulated a large fortune.   At the time of going to Thomasville he was about eighty-eight years of age and had never been married, and had no relatives nearer than nephews and nieces.   Prior to that time he occasionally gave property to some of his relatives, and had twice been to Europe, and given considerable property to some of his poor relatives there.   For a man of his age, he was very active and vigorous,

and above the average in intelligence. He was straight and honest in his dealings, and had ideas and opinions of his own, which became deeply rooted and seldom changed. The cashier mentioned tried to get him to make a will, to avoid litigation, but he vigorously declined, and said there would be a fight if he did make a will, and that he had his own ideas; that "he had a scheme in his mind"; that "he would never make a will"; that "he was opposed to it"; that "it would only give the lawyers a chance." That was just before he started South, and when his health was not very good. About the same time, Dr. Walter Kempster, who had known him for several years, had a talk with the deceased, and describes him physically and mentally, and, among other things, testified:

"His mental condition and knowledge of his property at the time I last saw him was good,—in fact, as good as at any time of my acquaintance with him. . . . He was a man of clear ideas, rather incisive in his method of stating things, and, having made up his mind that he was right, he was pretty apt to stick to his opinion, unless sufficient evidence was brought forward to overthrow it completely."

Such was the mental condition of the deceased when he started for Thomasville, on or about November 4, 1899. He reached there alone on the evening of November 6, 1899, and stopped at Hotel Brighton, of which Royal J. Miller was proprietor, and who, at the request of the deceased, registered his name as guest. The next day he called Dr. A. P. Taylor, of Thomasville, with whom he had become acquainted on former visits to that place. The doctor found the deceased was "having some trouble with his kidney and bladder,—a slight hemorrhage." November 9, 1899, Dr. Taylor prescribed for the deceased. At that time his mental condition was good. He next saw the deceased December 2, 1899, when he had the stroke of paralysis, and continued to see him every day thereafter until and including December 11, 1899. He

saw him five times thereafter during the balance of that month, and thirteen times during the month of January, 1900. During that time the deceased frequently said the doctor could do him no good, that his condition was incurable, and that he would call him when he wanted him. The stroke slightly affected his speech, but he conversed upon various topics,—some outside of his physical condition. He seemed satisfied after his niece (the defendant) and nephew got there. From the time he was first called to see the deceased, down to a week before his death, the deceased was "mentally competent to understand his business affairs and to transact business"; that he "never saw a brighter man than he was, in his physical condition." The testimony of the three subscribing witnesses to the deed of gift sufficiently shows that the deceased was of sound mind and memory at the time that deed was executed. There is plenty of evidence to support the finding of the court to the effect that at no time prior to and including December 7, 1899, was the deceased feeble in mind, or unable to manage his affairs and business; but, on the contrary, down to and including December 7, 1899, and for at least three weeks thereafter, he was of sound mind,—able to manage his affairs and property.

2. It is claimed on the part of the plaintiff that the deed of gift and order on the cashier of the bank to deliver the securities to the defendant were procured by undue influence. The important fact appears that the deceased had fully planned and determined upon such transfer while the defendant was a thousand miles distant, or on the way to his bedside by virtue of a command from himself. Thus it appears from the testimony of Royal J. Miller, a witness on the part of the plaintiff, that twelve hours after the deceased had the paralytic stroke he gave to the witness the address of the defendant, and requested him to send a telegram in his name, which he did, dated at Thomasville, Georgia, December 3,

1899, and directed to the defendant, *Miss Millicent Holmes,* at Mineral Point, Wisconsin, as follows:

"Come at once  Bring Ed.  I want you both.  Have paralysis on side.  Answer immediately.  Charles James."

According to his testimony, the deceased on the next day after he was so stricken, and on the same day the telegram was sent, first spoke to him "something about transferring his property to *Miss Holmes.*"

He testified further that it was at that "time that he gave me his money.  He gave me receipts signed by John Johnston for three or four certificates of deposit, amounting to somewhere in the neighborhood of $125,000, and $50,000 of government bonds.  At that time he stated that he wished to turn his property over to *Miss Holmes.*  He asked me to write a letter to Mr. Johnston, asking him to do so.  I then asked him if I understood that he wished to convey this property without any reservation, and, if so, I stated that Mr. Johnston would hardly deliver the property, under the circumstances, upon a letter written by me.  He then said, 'You have all the papers,—all that I have to show for the property,'—and asked me to proceed at once to take whatever steps were necessary; that he was not business man enough to know how to act.  I then advised him to wait, as his physician said he was in no immediate danger, and, being a stranger, I preferred to take no steps in the matter without the presence of some of his family.  This was the first intimation from him or any one else of a desire on his part to make any disposition of his property.  I think this is the only conversation I had with him about disposing of his property prior to the arrival of *Miss Holmes.*  *I advised him before she came* that it would be necessary to engage a lawyer.  I asked him if he wanted to make a deed, and I spoke to Mr. Alexander concerning this transfer prior to the arrival of *Miss Holmes.*  I don't think I gave Mr. Alexander the instructions—that is, the explicit instructions—until after *Miss Holmes* came.  He knew there was some paper to be drawn up, and that he would be sent for, but I did not give him instructions until after *Miss Holmes* arrived.  He knew the old man was going to do something.  I gave Mr. Alexander Mr. Johnston's receipt at some time for his use in the prepara-

tion of the necessary papers. Mr. Alexander may have gone to Mr. James' room and talked with him about the preparation of these papers, but not that I know of."

Mr. Hope H. Alexander, the lawyer who drew the papers, and a witness on the part of the defendant, testified to the effect that Dr. Royal J. Miller had informed him before the deceased was confined to his room that he (the deceased) "had spoken to him in regard to procuring the services of an attorney to draw an instrument of conveyance of all his property." He testified further as follows:

"December 4th or 5th Dr. Miller informed me that my services would be needed. He handed me two slips of paper,— mere memoranda of deposits in certain banks. Dr. Miller and Mr. James wished an instrument having a testamentary effect, but not a will, drawn, conveying all his property to *Miss Millicent Holmes.* I took these papers furnished by Dr. Miller, and examined them carefully. I did not understand thoroughly what he wanted, and at noon on the same day I returned to my room at the Hotel Brighton, and went to see Mr. James. I found him in his bed, and told him that I was in possession of certain memoranda handed me by Dr. Miller, which I did not understand thoroughly enough to prepare the instrument requested. I asked him to explain what he wished me to do. He said: 'I do not want a will. I simply want to give my property to my niece *Millicent Holmes.*' I understood from that what he wanted, and after exchanging a few words I returned to my office. If *Miss Holmes* had arrived in Thomasville, I did not see her. *I had not seen her up to that time.*"

According to both of these witnesses, the deceased had fully determined to transfer his property to the defendant from one to three days before she reached Thomasville, which was on the evening of December 6, 1899. The papers must have been completed or nearly completed before she reached Thomasville, as they were promptly executed the next day after she got there, and after they were read over to the deceased in the presence of the three subscribing witnesses, and he had declared them to be just what he wanted them to be.

There is no evidence that the defendant had anything to do with the execution of the papers,—much less, with the preparation of the papers. They undoubtedly embodied the "idea" or "scheme" the deceased had in his mind before leaving Milwaukee. He had spent most of the previous summer in Mineral Point, and left there in October, and went to Milwaukee, preparatory to going South. The telegram was the only communication the defendant had had with the deceased after he left Mineral Point in October. Before the defendant reached Thomasville, the deceased had, through Dr. Miller, sent for the money he had on deposit in Milwaukee, to be forwarded by draft payable to the defendant. The draft came in that form, and was between twenty-five and twenty-six hundred dollars. The defendant indorsed the draft, and Dr. Miller got it cashed at the bank, and, by the direction of the deceased, paid $2,500 of the amount to Alexander for his services in the matter. The fact that, after the execution and the delivery of the deed of gift, the deceased consented to and directed such payment to be made to the young attorney for his services may be a suspicious circumstance in the conduct of the attorney, yet it is no evidence that such deed was procured by undue influence exerted in behalf of the defendant or any one else. Of course, the amount of undue influence to invalidate a deed must necessarily vary with the strength or weakness of the mind of the person to be affected, but in any case it must be such as to destroy free agency. Here there is no evidence of any influence,—much less, of undue influence. The circumstances stated show that the deed was the result of his own volition, without suggestion from any one. Nor is the consent to such payment any evidence of a want of mental capacity at the time of the execution of the deed. True, he had been a close and frugal man; but he was manifestly convinced that he had but a few more days to live, and so he had transferred all his property, including the draft in question, to the de-

fendant. The execution of the deed was to him a very important event. It was just what he wanted. He was willing that the young attorney who drew the deed should be well paid out of the draft mentioned. Assuming that the young attorney's charges were very much too large, still, under the circumstances mentioned, it does not indicate a want of mental capacity or undue influence. So the fact, if it is a fact, that, a day or two after the execution and delivery of the deed of gift, Dr. Miller demanded, and the defendant agreed to pay, $5,000, within thirty days, for the services he had rendered, may excite suspicion as to Dr. Miller's conduct, yet it is no evidence of his having exercised undue influence or any influence over the deceased in the matter of executing the deed. There is no evidence that the deceased was a party to any such agreement. So the mere fact that the defendant, six days after the death of the deceased, voluntarily gave and transferred to the other nephews and nieces of the deceased a large portion of the property she had so received, and took back releases from them, respectively, is no evidence that she exercised undue influence over the deceased in procuring such deed of gift.

3. Exception is taken to the admission of certain testimony of the defendant as to certain declarations of the deceased made to her or in her presence, and also as to opinion evidence of certain of the nonexpert witnesses as to the mental capacity of the deceased, without stating the facts or circumstances upon which such opinions were based. Such admission of testimony may have been erroneous. But this is an equitable action. The important question is whether the findings in favor of the defendant are supported by competent evidence. We are clearly of the opinion that they are. In reaching this conclusion we exclude from our consideration all testimony to which exception was taken. We must hold that the judgment cannot be reversed on the plaintiff's appeal.

4. The defendant has appealed from so much of the judg-

ment as is in favor of the plaintiff and against the defendant for $739.12. That part of the judgment is based upon a finding that $634 which belonged to the deceased came into the hands of the defendant, and was not included in the money given to her by the deed of gift, and hence belonged to the estate of the deceased. A small portion of that money was included in the draft mentioned, made payable to the defendant, by the direction of the deceased, prior to the time when the defendant reached Thomasville. The balance of it was of money which the deceased gave to Dr. Miller "for safe-keeping as soon as he was taken sick," and before the defendant left Mineral Point. Dr. Miller appears to have deposited that money in the bank at Thomasville in the name of the defendant. It is undisputed that that money was drawn out of the bank by the defendant, and used by her in paying the expenses of the deceased and their board while at Thomasville, so long as it lasted; that it only paid a small portion of their expenses; that such money was so used by the defendant in paying such expenses by the direction of the deceased, who "told her to take that [money] and use it as long as it would last;" that "that much would not last very long," as they were then situated. Thus the money was all spent at the request and by the direction of the deceased, and really for his use and benefit. But even if it were to be regarded as a gift, yet the delivery seems to have been sufficient to satisfy a gift *inter vivos. Kilpin v. Ratley,* [1892] 1 Q. B. 582; *Kellogg v. Adams,* 51 Wis. 138, 8 N. W. 115; *Williams v. Hoehle,* 95 Wis. 510, 70 N. W. 556. It follows that there was no ground for holding that any portion of that money belonged to the estate.

*By the Court.*—That portion of the judgment of the circuit court from which the defendant has appealed is reversed, and the cause is remanded, with direction to modify the judgment accordingly, and the judgment in all other respects is affirmed.