VANCE and others, Respondents, vs. DAVIS, Appellant.

*May 29—July 3, 1903.*

*Equity: Deeds: Inequitable disposition of estate: Undue influence: Evidence.*

1. A conveyance by a widow of all her estate to a daughter, who, at the request of an elder brother and sister, had taken exclusive care of her mother for seventeen years, cannot be regarded as inequitable, so as to make it the duty of a court of equity to prevent its having effect.

2. In an action to set aside a deed from a mother to a daughter to the exclusion of the other heirs, the evidence, stated in the opinion, considered, and *held* to show that the situation was not such as to raise a presumption of fraud and undue influence, and require the daughter to disprove it.

APPEAL from a judgment of the circuit court for Vernon county: J. J. FRUIT, Circuit Judge. *Reversed.*

Action to set aside a deed executed and delivered by one Susan Vance to the defendant, her daughter, *Mary Jane Davis,* a few days before the death of said grantor, on November 20, 1901. The plaintiffs are the son and the children of the deceased daughter of said grantor. The premises consist of the 170-acre farm of the mother, upon which she had lived since the death of her husband in January, 1885; the same having first descended to his heirs at law, and been by

his three children quitclaimed to their mother in 1887. The defendant had, at the request of the other children, cared for the mother ever since 1885; not pecuniarily, but by looking after her, providing her daily and nightly companionship, and doing daily many acts of aid in her housekeeping, supplying her garden, and caring for her in frequent illnesses, and at the time of the execution of the deed being temporarily resident in the house with her mother. The deed was attacked on the ground of mental incompetence and fraud and undue influence. The court found that Susan Vance was mentally competent, though at the time ill and in pain from an acute disease (*peritonitis*), of which she died three days later; that the deed was executed during the temporary absence of the plaintiff *John M. Vance* from the mother's bedside, was without the knowledge of the plaintiffs, or any of them, and was made secretly, under circumstances indicating that the grantor and grantee desired to keep knowledge of its execution from the plaintiffs; that defendant then and for many years before occupied a position of trust and confidence; that the deed was caused and brought about by the undue influence of defendant, and was for the purpose of cheating and defrauding the plaintiffs out of their estate of inheritance in said lands. As conclusions of law, the court declared "that the legal presumption of undue influence and fraud in procuring the deed from the grantor by the defendant, who at the time stood in a position of trust and confidence to said grantor, has not been overcome by any testimony in the case." Whereupon judgment was entered setting aside said deed, from which the defendant appeals.

For the appellant there was a brief by *Silbaugh & Bennett* and *Higbee & Bunge,* and oral argument by *J. A. Bennett* and *E. C. Higbee.*

For the respondents there was a brief by *C. W. Graves* and *Smith & Griffin,* and oral argument by *Mr. C. J. Smith* and *Mr. Graves.*

DODGE, J.   The judgment rendered by the trial court was based upon two positions very definitely declared in an opinion filed and in the formal findings.   Those were, first, that conveyance of the whole farm to the defendant, to the exclusion of the son and grandchildren of the grantor, was inequitable, and that it was the duty of a court of equity to prevent its having effect; secondly, that the situation was such as to raise presumption of fraud and undue influence, and require defendant to. disprove it.   The specific findings of fact are, of course, to be read in the light of these preliminary positions assumed by the trial court.   *Maldaner v. Smith,* 102 Wis. 30, 78 N. W. 140; *Hill v. American Surety Co.* 107 Wis. 19, 26, 81·N. W. 1024, 82 N. W. 691; *Kelley v. Crawford,* 112 Wis. 368, 372, 88 N. W. 296.

We cannot at all agree with either the fact or the law of the first of these views.   Seventeen years of devoted attention from defendant, coloring her whole existence, controlling and modifying her life plans, and this, too, at the request of her elder brother and sister, who treated the situation as relieving them from substantially all filial responsibility, certainly might justify the parent in recognizing an equity of gratitude for which any pecuniary compensation she might be able to make would be no more ·than adequate, from her point of view, and certainly ought not to be subject of complaint by these other children, who had so promptly and completely transferred to the defendant's shoulders the filial burdens which they should have shared with her equally.   So much for the facts, of which more will appear in discussion of other questions.   As to the law, the position of the trial court was also fallacious.   The highest equity which courts can consider is the right of an individual to dispose of his property as he chooses.   The hope of inheritance which any child may indulge during a parent's life bears no comparison in the eye of the law with the right of disposal by the parent.   If Mrs. Vance, of her free will, gave this property to the defendant,

there is no duty of equity or conscience to thwart that will. The only question for the court, therefore, was whether the deed was the product of her own volition.

Approaching, then, the main question—whether the proofs established undue influence, either directly, or as result of an unrebutted presumption arising from the situation—it should first be noted that there is absolute lack of any direct evidence of subordination of the mind or will of the mother to that of the daughter; no proof that the slightest suggestion was ever made by the latter, or by any one in her interest. The fact does appear, on the other hand, that the mother's purpose and desire to make the conveyance in question were her own, at the moment of directing its preparation and of executing it. Of course, this fact alone does not exclude the possibility that her mind might have been preliminarily subjected to such influences as to destroy its autonomy, and to make her declarations and acts, even in the absence of the other person, the result of the latter's domination. Ordinarily, however, the free and intelligent declaration of a purpose to a third person, while relieved from the personal presence and control of the supposed influence, is a most cogently probative fact against that subordination of the grantor's will which must exist to warrant the nullification of her act. *Conley v. Nailor,* 118 U. S. 127, 135, 6 Sup. Ct. 1001; *Jackman's Will,* 26 Wis. 104, 111; *Marking v. Marking,* 106 Wis. 292, 295, 82 N. W. 133; *Deck v. Deck,* 106 Wis. 470, 82 N. W. 293; *Citizens' L. & T. Co. v. Holmes,* 116 Wis. 220, 93 N. W. 39, 43. Absence of such direct proof is, however, not final, for, in apparent contradiction of the ordinary rule requiring clear and direct proof of fraud, this and other courts have recognized the necessity of casting the burden of negative proof upon one who profits from a position of confidence and control by a conveyance of such character and made under such circumstances as to suggest improbability that it is the free act of the grantor, and probability that it is due to influence of the

beneficiary, which his confidential relation makes easy, but renders difficult or impossible of direct proof. The first thoroughly discussed case in this court recognizing the necessity for raising such a presumption was *Davis v. Dean,* 66 Wis. 100, 26 N. W. 737, succeeded by *McMaster v. Scriven,* 85 Wis. 162, 172, 55 N. W. 149; *Cole v. Getzinger,* 96 Wis. 559, 71 N. W. 75; *Doyle v. Welch,* 100 Wis. 24, 75 N. W. 400; *Disch v. Timm,* 101 Wis. 179, 77 N. W. 196; *Small v. Champeny,* 102 Wis. 61, 78 N. W. 407; *Fox v. Martin,* 104 Wis. 581, 80 N. W. 921; *Loennecker's Will,* 112 Wis. 461, 88 N. W. 215. Many forms of words have been used to express the conditions under which such a presumption is aroused, more or less exhaustive according as one or many circumstances were made prominent by the evidence and urged by argument. In *Davis v. Dean* the grounds were stated as relation of trust and confidence, absence of any reason for preferring the grantee, "the suspicious circumstances under which the conveyances were made," and the injustice to the legal heirs. The "suspicious circumstances" so summarized included many, such as active secrecy by way of deluding or persuading away certain of the relatives, and, prominently, that the declaration of the grantor's wishes, if made at all, was made while alone with the grantee, for he conveyed directions to the scrivener. In *McMaster v. Scriven* it is said not to be sufficient that the circumstances beget mere suspicion. In *Doyle v. Welch* the elements were summarized as conveyance by aged person of entire property, without consideration, to one in position of trust and confidence, under circumstances of secrecy. That was said, however, with reference to a situation involving many other circumstances suggesting influence—notably, that the grantor's resolution to convey to the defendant was brought about in a private interview between them, and that directions to the scrivener were all given by her, and, when ready, a hasty and private interview with the attorney was arranged for formal execution.

In *Small v. Champeny* it was said that such presumption arises only "because of circumstances appearing which satis-factorily suggest the wrong, and it is not till such circum-stances appear that it can properly be said the burden of proof to disprove wrong is on the person charged." In *In re Loen-necker's Will* the rule is stated that essential to such pre-sumption are a subject unquestionably susceptible to undue influence; also some clear evidence of opportunity, and a dis-position on the part of the benficiary to exert such influence. It is also reiterated that, in case of deeds, secrecy is a signifi-cant circumstance—more so than in execution of wills, about which testators usually desire privacy. Of course, in each of these cases the several forms of expression were used with reference to the facts before the court. Any of the circum-stances mentioned, and probably many others, may be pres-ent to so slight extent as to hardly arouse suspicion, or so ex-tremely as to strongly suggest influence. Thus the word "opportunity" has almost uniformly been given prominence where a private interview is shown to have taken place be-tween grantor and grantee upon the subject of the convey-ance, the result of which was a direction transmitted by the beneficiary for the preparation of the instrument. That word has not been used to express a mere possibility of private in-terviews, as between people in the same house, where there was no proof that any such took place. Again, the word "se-crecy" has usually been applied to active efforts by the bene-ficiary to exclude persons whose presence would have been natural, not to mere absence of such proclamation as is not usual with those freely making conveyances. The object of all such rules of law is the promotion of justice, and they must be limited by the reason of their existence. While it is an outrage that a doting and confiding parent be coerced into giving property where she would not, it is no less an out-rage that her will to give it to any particular child be thwarted by casting impossible burdens of exculpation upon such

donee. The rule of presumption of undue influence, and resulting invalidity of conveyances to those in confidential relations, which, within proper limitations, is salutary, will become a reproach to the law if it serve to defeat free and intentional gifts under such circumstances as ordinarily accompany them.

This record before us discloses the not unusual event of preference by an aged parent of one child over the others in the final disposal of the property, the parent's use of which is practically ended. Perhaps the completeness of the preference in the present instance is unusual, but so is the merit of the favored child, as compared with the others. She, the youngest child, at the solicitation of her brother, the eldest, assumed at her mother's widowhood, and for some seventeen years bore, substantially the entire filial duty of children to an aged mother, of daily and nightly aid and care, not involving so much of pecuniary assistance as of that personal service and responsibility which, while not easy of description or exact definition, constitutes a continual burden of thoughtfulness upon the daughter, and adjustment of her whole life and of each day's affairs to the needs of the mother, and which changes the declining years of the parent's life from a period of loneliness and discomfort to one pervaded by a sense of affectionate guardianship and aid. Could such services be rendered by a stranger, even the portion of them devoted to the material comfort of this aged woman during this term of seventeen years would have justified mere pecuniary compensation quite considerable in amount. Doubtless from such a period of devoted service on the one hand, and appreciative dependency on the other, resulted a relation of trust and confidence, which, by one so disposed, might be utilized to persuade the mother into donations contrary to her own independent wish, and transactions beneficial to the daughter must be carefully scrutinized; but to hold that, where such relation exists, no gift can stand, unless the daughter can

fully and directly prove absence of undue influence, is to cast
a penalty upon filial regard and attention, and a premium on
unfilial neglect.    Ordinarily, full direct proof in negation of
undue influence can consist only in the testimony of the bene-
ficiary, and that she is forbidden to give in most cases.    We
cannot agree with the trial court that the preference of this
only surviving daughter, after all her years of devotion and
service, was unnatural or improbable.    The mother consid-
ered, whether the fact be so or not, that the son had already
received a substantial share of the family property.    She also
felt aversion to diverting any of her property into the family
of the husband of her deceased daughter, who had married
again.    It is shown that some six years before her death she
had intended a division of property by which both the son
and the other daughter were to receive a share, but even then
she considered the defendant entitled to considerably more
than both of the others.    Subsequent to that time she had been
the recipient of six years more of service from the defendant,
and the other daughter had died, which had materially modi-
fied her views as to any duty to make benefice in that direc-
tion.    We cannot agree with the trial court that a change of
the purpose existing in 1895 indicated vacillation or weak-
ness of purpose in Mrs. Vance.    It is declared as essential to
the presumption relied on that there be proof of a subject
unquestionably susceptible to undue influence.    That element
is by no means clearly established in this case.    Mrs. Vance
appears from all the evidence to have been clear-headed, vig-
orous, and decisive, notwithstanding her eighty years.    It ex-
hibits her treating with her tenants, explaining and discuss-
ing relative quality of different parcels of land for different
crops, actively participating in salvage of household goods at
the burning of her daughter's house, when, by the way, she
first selected and secured the articles belonging to herself be-
fore proceeding to save others.    In all the incidents of her
relations with her children, and especially with the defend-

ant, which crop out through the testimony, there is pretty clear suggestion that the old lady's choice dominated. Her final illness was not of a character to materially affect her mental condition, and the testimony of physician, notary, and neighbor indicates comprehension and definiteness of purpose, coupled with readiness to express disagreement with views of those with whom she conversed. Age and illness are, of course, proved, and in sufficient degree to constitute some evidence of susceptibility to urgency or coercion, but they are strongly rebutted by other circumstances and events. Any inference of disposition on defendant's part to influence her mother can rest only on mere suspicion and conjecture. So far as the evidence goes, it is in direct negation thereof. True, that evidence is defendant's own statement that she refused to allow her mother to talk with her on the subject, but it is entitled to some weight when wholly without discredit from any known fact. That defendant secured to her mother opportunity to speak her wishes to an indifferent person—a neighbor—instead of indicating any desire to exert pressure, suggests quite the reverse. It enabled the giving of instructions if the old lady's mind was made up, but it also gave opportunity to invite conference with her children, or either of them, if she wished it.

Again, as to the element of opportunity for defendant to influence her mother, there was no proof such as characterized most of the cases cited. True, defendant is shown to have been persistently attendant at the bedside; but, so far as any evidence goes, the subject of disposition of property was not discussed. There can hardly be said to be opportunity to improperly influence the mind of another on any subject unless something is said with reference thereto. In all the other cases where presumption of undue influence was raised, there was proof of opportunity in this sense. Private interviews were shown, at which the grantor's assent to the questioned conveyances was claimed to have been given to the bene-

ficiary. Here, as in *McMaster v. Scriven,* 85 Wis. 162, 55 N. W. 149, it does not appear that defendant had any knowledge of the intended disposition of the property until after it had been declared to a neighbor for the purpose of being communicated to the scrivener. The element of secrecy is completely negatived by plaintiffs' own evidence. The notary called in was an intimate friend of the plaintiff *John Vance.* He came openly in presence of one, if not two, of the plaintiffs—*Mrs. Alling* and perhaps *Jessie Mills.* His seal and blank deeds declared his errand. He wrote the deed in a room to which all those present had access. His acts could have been observed by *Mrs. Alling,* and that they were observed by and known to her is strongly suggested by the fact that she does not take the stand to assert anything to the contrary. He testifies there was no appearance of secrecy. Almost the only suggestion in that direction is the absence of *John Vance,* and counsel attempt to give a color of seizing an opportunity of a mere temporary absence. This coloring, however, has no support in the evidence. *John Vance's* attendance upon his mother was not characterized by such persistency as to necessitate any effort to find him absent. While he called daily, and sometimes twice a day, during his mother's last illness, they were mere calls, and not more. True, he might have been sent for, but for twelve years his mother had managed her affairs without his aid; and if, as appears to have been the case, she had reached a decision, it is not surprising that she should see no reason for breaking a habit of so many years' standing. The omission to procure the presence of *John Vance,* under the circumstances, was not such secrecy as suggests a wrongful purpose.

The facts and circumstances thus referred to so fully distinguish this case from both the facts and the reasons which controlled those in which a presumption of undue influence has been indulged as to take it fully out of their doctrine. There was not enough to raise any such presumption against

the defendant, and, in the absence of any direct proof of such conduct on her part, the plaintiffs have failed to establish the cause of action set forth in the complaint, which therefore should have been dismissed.

*By the Court.*—Judgment reversed and cause remanded, with directions to enter judgment dismissing the complaint.