DRINKWINE and others, Respondents, vs. GRUELLE and wife,. Appellants.

*February 5—February 23, 1904.*

*Witnesses: Adverse examination: Transactions with person since deceased: Competency: Deeds: Mortgages: Setting aside: Undue influence:. Evidence.*

1. A father gave a mortgage to his son-in-law and afterwards the father delivered to him a deed of the same premises and the son-in-law satisfied the mortgage. ' In an action by children, after the father's death, to set aside the mortgage and deed because obtained by fraud and undue influence, the plaintiffs examined the son-in-law as an adverse party, under the authority of sec. 4068, Stats. 1898, as to the execution of the two instruments, and called out testimony, to the effect that the only consideration paid therefor was the support and care of the father for the last five or six years of his life, his doctor bills, funeral expenses and $15 in money. *Held*, that the plaintiffs thereby, under sec. 4069 (precluding a party from testifying as to transactions and communications with persons since deceased, except under certain situations), opened the door for the admission of testimony of defendants as to the exact consideration for the instruments.

2. Influence or importunity, to be undue, must destroy, or at least impair or prevent, free agency.

3. In an action to set aside a deed and mortgage alleged to have been obtained by fraud and undue influence, the evidence examined, and *held* not to sustain findings of undue influence.

4. In such cases, the judgment is not to rest on mere suspicion or assumption, or on findings that rest largely upon the existence of ill feeling and opportunity to stimulate ill feeling.

APPEAL from a judgment of the circuit court for Clark county: JAMES O'NEILL, Circuit Judge. *Reversed.*

It appears from the record, and is, in effect, found by the court, that Larry Drinkwine, Sr., died intestate November 13, 1901, at the age of eighty-one, leaving, him surviving, five children, the youngest of which was thirty years of age. The three sons and the youngest daughter commenced this action March 3, 1902, against the other daughter, *Villa;.*

and her husband, *Otto Gruelle,* to concel and set aside a mortgage executed by the deceased to the defendant *Otto* April 10, 1897, on eighty acres of land then owned by him, and upon which he and the defendants then resided, and which mortgage purported to secure the payment of $3,000, according to the terms of a promissory note for that amount, and was recorded April 12, 1897; and also to cancel and set aside a warranty deed of the same land to the defendant *Otto,* executed by the deceased February 18, 1901, and reciting a consideration of $1, and purporting to be given in satisfaction of the mortgage, and which deed was recorded February 19, 1901, and to have the title to said real estate adjudged to be in the four plaintiffs and the defendant *Villa* share and share alike, to each an undivided one fifth interest thereof, on the ground that the mortgage and deed were respectively procured by the fraud and undue influence of the defendants on the deceased when he was weak and feeble in mind and body. The defendants answered by way of admissions, denials, and counter allegations. At the close of the trial the court found as matters of fact, in effect, in addition to the facts stated, that the deceased was during his whole life illiterate, and unable to read or write; that at the time of his death and for five years prior thereto he had been eccentric, childish, easily influenced, became angry at trifles, was excitable, of strong prejudices, his faculties (eyesight and hearing) somewhat impaired, and had transacted no business except as stated; that his wife died in September, 1896; that at that time his son *George,* who was then unmarried, had been living with him and working the farm for eleven years after he became of age; that during that time his father gave him a deed of the farm, which was never recorded, and which he returned to his father to keep for him, but never got it afterwards; that when his mother died, in September, 1896, *George* left the farm, and the defendants moved onto the place, and the deceased made his home

with them; that thereupon the deceased became cold and un-friendly toward the plaintiffs, and ceased to counsel with them; that the mortgage and deed were each given without consideration, and by undue persuasion, importunity, and influence exercised by the defendants over the deceased; that some time between the giving of the mortgage and the deed the deceased executed to the defendant *Otto* a bill of sale of his personal property; that during the five years before he died the deceased drew a pension from the United States of $12 per month; that the defendants fraudulently concealed from the plaintiffs and others the real transactions in obtain-ing the bill of sale and deed by falsely and fraudulently claiming to have paid full value for the same in cash; that during the five years the deceased lived with the defendants they in some manner prejudiced him against *George* by con-vincing him that *George* had forged his name to a note for $700, and prejudiced him against the plaintiff *Viola* by con-vincing him that she was not lawfully married to the man with whom she was living. And as conclusions of law the court found, in effect, that the plaintiffs were entitled to the relief demanded in the complaint; that the mortgage and deed were procured by the defendants through their fraud and undue influence practiced upon the deceased during his lifetime, and should be canceled and set aside; that the de-fendants and all persons claiming under them since the filing of the notice of the pendency of this action be forever barred against having or claiming any right or title to the lands de-scribed adverse to the plaintiffs, except as to such interest therein as the defendant *Villa* may have inherited as one of the heirs of the deceased; that the plaintiffs are entitled to their costs in the action, and ordered judgment to be entered accordingly. From the judgment so entered the defendants bring this appeal.

For the appellants there was a brief by *Sturdevant & Clark,* and oral argument by *L. M. Sturdevant.*

For the respondents there was a brief by *J. R. & C. R. Sturdevant* and *S. M. Marsh,* and oral argument by *C. R. Sturdevant.*

CASSODAY, C. J.   It is evident that the intestate was an eccentric man, with peculiarities of temper, disposition, and habits.   He was easily excited, and became angry at trifles, and was strong in his prejudices, and set in his notions.   His qualities of head and heart were necessarily known to his children, as indicated by their intercourse at times and want of intercourse at other times.   But the trial court held, and counsel concede, that there is no evidence "of such mental unsoundness as would warrant the court in finding that the deceased was incapable of executing the instruments in question."   Having the mental capacity to execute the mortgage and deed in question, it must be conceded that the intestate had the legal right of his own free will to convey his farm to whomsoever he pleased, regardless of the moral obligations which parents ordinarily feel toward all their children.   It may be questionable whether the intestate was ever impressed with any such moral obligations.   Years before his wife died he had voluntarily conveyed the farm to his son *George,* with no expectation of receiving anything in return except care and support.   *George* was unmarried, and about thirty-five years of age, when his mother died.   Upon the death of his mother he and his father were left alone on the farm.   Manifestly, his experience had been such that he did not wish to remain longer on the farm.   Years before he had received a deed of the farm from his father, and returned it to him to keep for him, and never asked for it nor received it afterwards.   The intestate was seventy-six years of age when his wife died, and the next day after her funeral he asked his eldest son, *Larry, Jr.,* what would be the best thing for him to do in view of the fact that he had nobody to keep house for him; and *Larry* told him that he "thought the best thing

he could do was to get *Otto* to stay on the place, and he could
work the place—rent it or work it any way to his satisfac-
tion," and that then was the time to make the arrangement
with *Otto* and *Villa,* who were present; and the intestate
then said that he would like to have *Otto* and *Villa* stay with
him, and keep house, and do the work, and that, if they did,
at least for the winter, he would pay them what was right;
and an arrangement was then made, and the defendants then
moved upon the place, and they remained there until he died.
The intestate had but two daughters, and it was natural that
he would want to live with one of them.  About seven months
after the death of the wife the intestate gave to *Otto* the
mortgage in question, and nearly four years after that he
gave to him the deed in question.  The precise consideration
of the mortgage and deed in question does not appear.  The
offer of the testimony of the defendants tending to show such
consideration, or the agreement upon which such mortgage
and deed were given, was excluded by the court on the
ground that it called for transactions between them and the
deceased within the meaning of sec. 4069, Stats. 1898.  And
yet the plaintiffs had previously called the defendants, and
examined them as adverse parties, under sec. 4068, as to the
giving of the mortgage and the deed by the deceased to the
defendant *Otto;* that the only consideration paid therefor
was the support and care of the old man for the last five or
six years of his life and his doctor's bills and funeral ex-
penses and $15 in money; that the defendants went with the
deceased to town at the time the mortgage was executed, and
also at the time the deed was executed; that *Otto* received a
transfer of the personal property before he received the deed;
and that in consideration of the mortgage the defendants were
to support and care for the deceased during the last five years
of his life.  We are constrained to hold that by such adverse
examination the plaintiffs, under the statutes cited, opened
the door for the admission of the testimony of the defend-

ants offered, tending to prove that the consideration for the mortgage was an agreement on the part of the defendants to support and take care of the deceased during the remainder of his life—provide food and necessary clothing, medical attendance, and a decent burial; and that a similar agreement was the consideration for giving the deed; and that the exclusion of such testimony was error.

To sustain this judgment it is necessary to hold, as the trial court did hold, that the deceased was induced to execute the mortgage and the deed by the undue influence of the defendants over him, It is certain that the defendants moved onto the place at the request of the deceased, and rendered services, care, and support for him for more than five years, while the other children rarely visited him. The conduct of the defendants may, in part, account for their absence, but the fact nevertheless remains. The deceased was certainly under some obligations to the defendants for such services, care, and support. Influence or importunity, to be undue, must destroy, or at least impair or prevent, free agency. Even in the case of the execution of wills, where the testator is not supposed to be under any legal obligation, this court held many years ago:

"Undue influence in such a case is such an influence that the instrument is not properly an expression of the will of the testator in regard to the disposition of his property, but rather an expression of the will of another person. Motives of natural affection and gratitude on the part of the testator, and solicitations or arguments which appeal to such motives, do not constitute undue influence." *In re Jackman's Will,* 26 Wis. 104, 111–114; *Deck v. Deck,* 106 Wis. 470, 472, 473, 82 N. W. 293.

It sufficiently appears that the deceased was in the habit of exhibiting his free agency on numerous occasions. He was repeatedly angry at the defendant *Otto.* On one or two occasions he went so far as to take an ax at him. It manifestly required tact and skill and patience to get along with him.

The deed was executed about nine months prior to his death, the immediate cause of which was pneumonia. The man who drew the deed testified to the effect that the deceased came to his office alone, and asked him if he was a notary public, or could make a deed; that he told him he could; that he then said he wanted to make a deed to the defendant *Otto;* that he then went out, and said he would be back in a few minutes; that he soon returned with the defendant *Otto,* and said he was ready to make the deed, and gave to the notary the instructions concerning the deed; that the notary wrote the deed for him, and asked him if there was a mortgage on the place, and he said there was, and he was giving the deed to satisfy the mortgage, and he thought it was so stated in the deed; that one of the two persons who subscribed the deed as witnesses wanted to know what the paper was; that the notary then read the deed over a second time before it was signed, and asked the deceased if that was his own free will, and he said it was; that he then asked him if he had been coaxed into it, and he said he had not; that the deceased seemed to understand it perfectly; that the defendant *Otto* was in the room, but said nothing. Neither of the subscribing witnesses to that deed were examined or called. The undisputed evidence as to the facts and circumstances attending the making of that deed preclude any inference that the deceased was induced to execute the same by fraud or undue influence. Besides, the deed had been on record for nearly nine months when the intestate died, and the mortgage had then been on record for four years and seven months. The deceased frequently, and for years, had stated that the place belonged to *Otto.* The plaintiffs, or at least three of them, knew for years prior to their father's death that the defendants claimed to own the place. The only pretense of concealment is that the defendants, or one of them, stated to the plaintiffs and others that they had bought the place, and paid $3,000 in cash for it, which they had bor-

rowed. That they so stated that they paid in cash, however, is denied. There is evidence to the effect that the deceased made similar statements. At the time the mortgage was given the value of the place appears to have been about the amount stated in the mortgage. In view of the strained relations of some of the parties, it is not very significant whether such statements were made or not. Their bearing upon the question of undue influence is, at most, remote. The same is true as to the story about *George* having forged a note, and *Viola* not having been lawfully married. There is no pretense of the deceased having been prejudiced against the plaintiffs *Larry, Jr.,* or *John.* None of the plaintiffs appear to have questioned their father in respect to his having given the mortgage or the deed. We fail to find evidence sufficient to support the findings of undue influence. Such findings seem to rest largely upon the existence of ill feeling and opportunity to stimulate ill feeling. But judgments, in such cases, are not to rest upon mere suspicion and assumption. The case differs broadly in its facts from those relied upon to support the judgment. See *Disch v. Timm,* 101 Wis. 179, 191, 192, 77 N. W. 196, and cases there cited. The principles of law applicable to the facts in this case are sufficiently covered by recent adjudications of this court. *Fox v. Martin,* 104 Wis. 581, 80 N. W. 921; *Deck v. Deck,* 106 Wis. 470, 82 N. W. 293; *Loennecker's Will,* 112 Wis. 461, 88 N. W. 215; *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939. We must hold that the findings of undue influence are not sustained by the evidence.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with directions to dismiss the complaint.