LAMBERSON, Respondent, vs. LAMBERSON and others,
Appellants.

*June 1—December 13, 1921.*

*Specific performance: Land contract of father to son: Evidence:
Sufficiency: Witnesses: Competency: Transactions with de-
ceased persons: Waiver of incompetency: Opening door:
Adverse examination: Use: Appeal: Findings not essential
to judgment.*

1. In an action to compel the conveyance by the executor of land
   deeded to plaintiff by decedent, his father, where plaintiff
   was fully examined under sec. 4096, Stats., before trial and
   cross-examined at the trial as to portions of such examina-
   tion, and defendants made his deposition a part of the record
   without qualification, plaintiff's testimony therein concerning
   transactions with deceased became admissible.

2. While an adverse examination is not a part of the record until
   offered, the party taking it may offer it, whether the party
   examined be present or not (sub. 2, sec. 4096, Stats.); and
   though it cannot be offered by the party whose deposition is
   taken, it may be used by him when offered as evidence for the
   other party, as though he were called in rebuttal to testify
   concerning transactions therein testified to.

3. The evidence in this case is *held* sufficient, in view of the rela-
   tions shown to have existed between the father and the son, to
   support a finding that plaintiff and decedent signed a land
   contract covering the property in question, that its terms were
   substantially as testified to, and that it was intended to vest
   title in plaintiff, though the latter did not take possession, de-
   manded no accounting, and made no assertion of ownership
   during his father's life.

4. Findings not essential to support the judgment may be dis-
   regarded.

5. Evidence as to the relationship between the parties, the under-
   standing of members of the family that plaintiff was not
   physically fitted to manage a farm, that he was occupied in
   other pursuits with the approval and consent of his parents,
   that his father was able to supervise the management of the
   farm and arranged to have it conducted by plaintiff's brothers
   or their sons, together with plaintiff's natural hesitancy, in
   such circumstances, to deal with his father on a strictly busi-
   ness basis, is *held* to justify the conclusion of the trial court
   that he did not abandon his rights under the contract, though
   he did not occupy and manage the farm.

   SIEBECKER, C. J., and OWEN, J., dissent.

APPEAL from a judgment of the circuit court for Trempealeau county: LEVI H. BANCROFT, Judge. *Affirmed.*

The plaintiff brought this action to compel conveyance to him of a certain farm of 160 acres in Trempealeau county, Wisconsin, and also to compel an accounting for the profits from the same accruing during the lifetime of his father, the alleged grantor, and from the defendant *Alfred Lamberson,* who as executor of the father's estate had subsequently retained possession. The trial was had before the Hon. GEORGE CLEMENTSON, to whom the case had been transferred, and upon his death prior to its determination, by stipulation, the record was submitted to and a decision made thereon by Judge CLEMENTSON's successor, Hon. LEVI H. BANCROFT.

The question of accounting under the second cause of action was sent to a referee for hearing, and upon stipulation by the parties there a determination was had that the debits and credits on any such accounting were equal and no amount due either party from the other in such matter. Such finding of the referee was confirmed by the judgment herein.

John C. Lamberson owned and managed considerable farm property in the neighborhood of Whitehall in said Trempealeau county. His family consisted of his wife and four children, in the order of their ages as follows: *Alfred,* Bernice Lowe, *George,* and *Lloyd.* *Lloyd* was the only minor and about nineteen years of age in December, 1901, and then living with his parents. In November, 1901, John C. Lamberson was stricken with what appeared to have been some trouble with his heart, from which he recovered shortly thereafter to a considerable extent, yet he never thereafter carried on the active management of his property. A short time thereafter he gave up his home at Whitehall, purchased a homestead at Winona, Minnesota, and resided there with his wife until his death in 1917. From about the 1st of December, 1901, and during substantially the whole of said month he gave considerable and serious consideration to the matter of disposing of his property interests in case of his

death.  He consulted with Mr. Ekern, then practicing law at Whitehall, and numerous drafts were prepared by Mr. Ekern of land contracts as to certain real estate and also forms of wills.  The record does not disclose which, if any, of such proposed wills were signed by him at that time.

He submitted to the three older children some at least of such proposed land contracts and wills and invited suggestions from such children with reference to their contents.  He had in April, 1897, conveyed to the second son, *George,* a farm, the deed therefor placed in escrow with a bank at Whitehall, which was not to be delivered to *George* until after the death of the father.  It remained there until after the father's death and was then recorded.  This conveyance was expressly referred to in the several drafts of subsequent wills and expressly confirmed and ratified in the probated will of Mr. Lamberson made in 1915.

In December, 1901, it appears that he had left three farms, one of which consisted of about 160 acres, forty acres of which had formerly belonged to a man by the name of Daggett and 120 to a man named Dowd, and which was designated at times by Mr. Lamberson and the family as the Dowd-Daggett farm, which is the one here involved.

Some question was raised on the trial as to whether Mr. Lamberson owned the entire interest in this property in December, 1901, but it is not deemed material in the disposition of this case, for it is alleged in the complaint and admitted in the answer that he was, at the time of the transaction here involved, the owner of said farm.

On December *24,* 1901, Mr. and Mrs. Lamberson signed and acknowledged two copies each of land contracts to the sons *George* and *Alfred,* respectively, of two of the three several farms.  One land contract was written out in full in typewriting, the other was on a printed blank, filled in by typewriting, and each set dated as of December *18th.* Each fixed a purchase price for the respective pieces, with a provision that the payment of the substantial part of such

purchase price was not to be made until after the death of
the father, and provided for annual payments of interest
during his lifetime at a rate of approximately three per cent.

*Alfred* and *George* entered into possession of such farms
and continued to hold the same until the death of the father.
Such land contracts were not recorded during the father's
lifetime. One copy of the land contract to *George* was kept
by him, and both copies, the one in *George's* and the one in
the father's possession, had indorsed upon the backs thereof
the payments made from time to time of the interest. The
typewritten duplicates of the land contract to *Alfred* were
both kept by the father in the bank with his other papers and
to which it appears *Alfred* also had access. The indorse-
ments of payments were made on but one of these land
contracts.

After the death of the father there was found among his
papers a land contract with the plaintiff's name as grantee
and which had been signed by the father and mother. This
was taken with other papers by the son *Alfred* and placed in
a box in the vault in the bank at Whitehall, and, as appears
from his testimony, upon making a search therefor at his
mother's request some ten days or two weeks subsequently
he was unable to find the same and it was not produced at
the trial. Due notice to produce the same was given on be-
half of the plaintiff to defendants prior to the trial.

The mother, widow of John C. Lamberson, testified that
she did, on December 23, 1901, with her husband, sign a
land contract of the 160 acres in which the son *Lloyd's*
name appeared as grantee. She testified that she neither
saw it signed by *Lloyd* nor delivered to him, he coming into
Mr. Ekern's office, where the various transactions were had,
just as she was leaving.

The plaintiff never took possession of this farm or as-
sumed any direction with reference to its management and
never demanded any accounting as to its proceeds during his
father's lifetime. The relationship between the father and

the three sons continued to be always friendly. The plaintiff, apparently with his parents' consent, was taking a course in a business college at about the time of the transaction, was subsequently in the harness business at Whitehall, and traded the same for a farm in the northern part of the state, but never undertook to run the same, and was subsequently and up to the father's death and thereafter employed as an accountant for the Studebaker corporation in Indiana, where he was living at the time of the trial.

This particular farm was for one season rented to the husband of Mrs. Lamberson's daughter by a former marriage. Thereafter and until the death of the father it was rented on shares by the sons *Alfred* and *George* or their respective sons. Accounts appear to have been kept by the father during the balance of his life as to the transactions with reference to this particular farm and accounts stated by him from time to time with reference to the charges, expenses, and proceeds thereof. In such of the statements as are in evidence it appeared that it was therein designated by the deceased under the term "Dowd" or "Daggett" farm. No writing was produced in which the deceased designated it as belonging to *Lloyd* or appeared to keep an account of it with him.

In one of the drafts of his proposed will drawn in December, 1901, and preserved in Mr. Ekern's files, he speaks of three land contracts to the three sons, naming them. In 1915, apparently upon ascertaining that he was then suffering from cancer, he executed his last will, subsequently admitted to probate, in which he specifically devises this particular 160-acre farm to the son *George* subject to a charge of $7,000, making no reference to any possible interest of *Lloyd* in the same. The general nature of this will appears to have been known at about the time of its execution to the sons *Alfred* and *George*. Neither his wife nor daughter, however, had any information concerning the

same prior to his death as they had of his proposed wills in 1901.

The daughter, Mrs. Lowe, testified to her father having brought to her in the early part of December, 1901, three proposed forms of land contracts unsigned and also of a will, that she and her father read them over at the time and discussed them, and particularly the contract for *Lloyd,* and that in the form of will shown her at that time the fact of the execution of three land contracts was expressly mentioned; that she was asked by her father to discuss the various documents with her husband and write fully her opinion. She did so write him a letter in the record, of December 9, 1901. She further testified that on New Year's day following her father came to her house and stated to her: "I have got those papers all signed up now and everything is finished and it doesn't make any difference whether I am dead or alive." That at the time of the first interview he expressed himself as not intending that *Lloyd* should go on the farm owing to *Lloyd's* condition of health and that he could do better at some other kind of work, and that he, the father, could just as well manage the place, the other two boys living right near there.

On Mrs. Lowe's cross-examination she was asked by defendants' counsel as to whether she knew that there was a contract signed by *Lloyd,* and the following took place:

"*A.* My father said it was signed. That is all I know about it. *Q.* Simply said it was signed? *A.* Yes, he said it was signed and his business all completed. I have a letter in which he states that everything is done. *Q.* I am not asking for your letter now. *A.* All right." (No reference appears to have been subsequently made on the trial to this letter nor was it produced.)

She further testified on direct examination that a number of times subsequently he spoke of this farm as being *Lloyd's* place.

The mother also testified that it was referred to by the father between 1901 and 1907 as *Lloyd's* place. A lady who lived near the family in Winona, while visiting at Whitehall, was also told by the father that this farm was *Lloyd's* and that he had given three farms to his sons.

At the close of the oral testimony, when defendants' counsel stated that he was through with their part of the case, he also stated that there were certain depositions taken in the matter which were to be considered as in the case, plaintiff's counsel stating that it was the same for their side with examinations they had also taken. Defendants' counsel then stated that he referred to the deposition of Mrs. Lamberson, the widow, "the adverse examination of *Lloyd Lamberson*," and other depositions. The court then ruled that all those are now introduced subject to any objections that could be now made. Defendants' counsel then announced that their case was closed.

The findings of fact by the trial court who determined the case, in substance, so far as being material on this appeal, were to the effect that the land contract as alleged by the plaintiff was executed by the deceased and his wife December 23, 1901;

The death of John C. Lamberson leaving a last will which was duly admitted to probate and the devising therein of the lands in question to the defendant *George Lamberson;*

That after the making of the contract of December 23, 1901, the original of said contract was by mutual consent left in the possession of John C. Lamberson;

That by mutual arrangement between the parties to such contract John C. Lamberson was left in possession and was to receive the rents and profits and pay the taxes and assessments and account to the plaintiff for any difference over and above such and the $125 annual payment specified in said contract;

The readiness and ability, during the lifetime of John C. Lamberson, of the plaintiff to pay anything that might be due from him on account of said contract and the same so

far as the executor is concerned, but that plaintiff was unable at any time, either from the said John C. Lamberson or his executor, to obtain any statement of account in such matter and has therefore been unable to pay the same;

That the plaintiff has demanded possession of the real estate and an accounting with the executor;

That there has been a refusal on the part of the executor to convey, and the defendant *George Lamberson* claims an interest in the said real estate under the will aforesaid;

That the contract has never been revoked or abandoned by the parties thereto and is still of force and effect.

As conclusions of law:

First, that the plaintiff is entitled to judgment for the immediate possession of the land;

Second, for an accounting;

Third, that the defendant *George Lamberson* is barred from all right, title, and interest in and to the real estate.

As appears from his memorandum decision, the trial court deciding the case considered the evidence of the plaintiff as to the execution of the contract by the deceased and in effect overruled the objection interposed by defendants to such testimony, but apparently on the ground that the proper objection had not been interposed.

From the judgment entered in favor of the plaintiff the defendants *Alfred Lamberson,* as executor, and *George Lamberson* have appealed.

For the appellants there was a brief by *Tawney, Smith & Tawney* of Winona, Minnesota, and *Ole J. Eggum* of Whitehall, and oral argument by *Mr. Eggum* and *Mr. W. J. Smith.*

For the respondent there was a brief by *Cowie & Hale* of La Crosse and *A. V. A. Peterson* of Whitehall, and oral argument by *Quincy H. Hale.*

The following opinion was filed October 18, 1921:

ESCHWEILER, J. Laying aside for the time consideration of the testimony of the plaintiff, there is ample evidence in

the record upon which the findings of the court can and should be upheld so far as they determine that a land contract for this farm of 160 acres was signed by John C. Lamberson and his wife on December 23, 1901, at Mr. Ekern's office at Whitehall and on an occasion when the plaintiff was at the same office. The testimony of Mrs. Lamberson was properly received, and without objection, to that effect. It also appears from defendants' own testimony that a land contract wherein *Lloyd Lamberson* was named as grantee and signed by John C. Lamberson and his wife was found among the father's papers in the safety-deposit box after his death. It therefore may be considered as conclusively shown that Mr. Lamberson, then evidently considering the future disposition of all of his property and giving by his land contracts of December 24th two of these three farms to *Alfred* and *George,* did on the preceding day go so far at least as to have reduced to writing and signed by himself and wife a land contract making the plaintiff the grantee, under substantially similar conditions, of the remainder of his real estate, the farm here involved. He had thus evidently by December 23d and 24th reached a definite and declared conclusion as to the disposition he wished to make of his property, and in accordance with the suggestions, in a general way at least, embodied in the forms of contracts and wills that had been submitted to the two older sons and the daughter and concerning which the advice of each of them had been sought. It negatively appears that *Lloyd,* the youngest, a minor and not deemed presently able to carry on farm work, was not consulted concerning the matter, although evidently the subject of the parents' solicitude and affection. As late as December 19th, in a letter to the son *Alfred,* the father says, "Look the contracts over and see if they are what you expected and let me know by return mail as *my will has got to be based on these contracts.*" No suggestion appears in the record that

any objection was made by any of the three older children to the fairness of the proposed division or the particular provision for *Lloyd.*

*George* testifies that he knew the father contemplated giving *Lloyd* the Dowd-Daggett farm about the time that his, *George's,* contract and *Alfred's* contract were made out. He also testifies that he saw all three contracts at about that time, that *Alfred's* was then executed, his was not, and *Lloyd's* was not. It is evident, however, from the face of the land contracts to *Alfred* and *George,* in each of which the date of acknowledgment of December 24th is written in with pen and ink rather than by typewriter, that he must be confused or mistaken as to the precise time when he saw these land contracts, because it is a verity that the contract to *Lloyd* was signed and preceding either of the others.

The preservation by the father of this signed land contract to his youngest son among his valuable papers rather than leaving them in Mr. Ekern's office files, as was the case with the drafts of the unexecuted wills and land contracts; the evident intention in December, 1901, of making a complete future disposition of all of his real property; the absence of anything showing that he was wavering in his mind as to whether he would give this 160-acre farm to either *Alfred* or *George* rather than to *Lloyd;* the disposition he was then making and did make for these two elder brothers; the fact that the only changes suggested during this period were more as to matters of detail than as to the general scheme; his stating to the daughter New Year's day that all was finished, are very persuasive in confirming the conclusion of the trial court that there was then a completed, effectuated disposition of all of his real property by the signing and acknowledging of three land contracts of equal force and validity, rather than, as contended by defendants, a halting by him after he and his wife had signed and acknowledged the land contract to *Lloyd* and thereby changing in such substantial

manner his general scheme for division and as against his youngest child and without any apparent cause for so excluding him.

The apparent assertion by the father in his last will, made in 1915, of a then contrary intent as to this farm by his devise thereof to *George,* can have no weight, therefore, in the disposition that must be made here of the rights of the plaintiff arising, if at all, by the transaction of December, 1901. *Jones v. Caird,* 153 Wis. 384, 386, 141 N. W. 228.

Considerable stress is laid by appellants upon the testimony of Mr. Ekern and his then stenographer to the effect that the copy of the signed land contract to the plaintiff which was found in the office files as late as 1919 was the original ribbon copy and the one which, under the custom of the office, would be the one to be signed by the parties, and upon the improbability of the sister, Mrs. Lowe, being able to recollect the description of the property covered by the land contract; but these are not of much significance in view of the undisputed fact that some form of a land contract was signed by Mr. and Mrs. Lamberson with *Lloyd* named as grantee, that Mrs. Lamberson knew that it was of this particular property, that it was subsequently so referred to by the father as being plaintiff's farm, and, perhaps what is more significant than all, that *Alfred Lamberson,* executor of the estate, the only one who saw the contract after the father's death, does not testify that such contract was not of this particular farm; also that there was no other real estate belonging to Mr. Lamberson at that time than this farm which was not then disposed of by deed or land contracts to the other sons.

Unless defendants have by their procedure on the trial waived the objection which was properly interposed under sec. 4069, Stats., as to the want of competency of *Lloyd* to testify to a transaction or communication with his father now deceased, his testimony as to the contents of the land contract of December 23, 1901, cannot be properly considered in this case. *Felz v. Estate of Felz,* 170 Wis. 550, 553,

174 N. W. 908. And the same would hold good as to his testimony of his signing the land contract in the presence of his father, having then received it and immediately returning it. *Jackman v. Inman,* 137 Wis. 30, 118 N. W. 189; *Chase v. Woodruff,* 138 Wis. 641, 646, 120 N. W. 499.

We think, however, that this testimony of the plaintiff was properly before the trial court for consideration in disposing of this case. On the adverse examination of plaintiff, taken at the instance of the defendants more than a year prior to the trial, he was examined fully by defendants' counsel upon a stipulated notice that he should produce on such examination the written evidence, records, etc., of transactions between plaintiff and said John C. Lamberson. He was there asked as to whether he took any part in the leasing of the farm after December, 1901; as to having the original or a copy of the alleged contract of December 23, 1901, and testified without objection that he did have the original in his possession at the time it was signed by him and at the date thereof; as to the number of copies that were signed; and in response to a question as to whether he could recall the contents of the alleged contract he answered:

"I know the general provisions of all three contracts, as I read them at the time I signed my contract, and Mr. Lamberson was particularly careful about showing me the other boys' contracts, and I read these contracts as well as my own and read the will made at that time providing for the disposal of his property, in which will, I believe, these contracts are all mentioned."

Defendants' counsel then moved to strike out all that part of the answer after the words, "I know the general provisions of all three contracts, as I read them at the time I signed my contract," as being unresponsive to the question. This objection, however, was not renewed at the trial.

When called as a witness on his own behalf at the opening of the trial he testified without objection as to being called by his father to Mr. Ekern's office December 23, 1901, and

that a written instrument was handed him at that time which he read over carefully. Defendants' counsel then objected to his testifying to the effect that he was asked to sign it by his father, on the ground that it was incompetent as being a conversation with a deceased person. The court received it subject to the objection, and plaintiff then testified that he did sign it in the presence of two witnesses and after the signatures of his father and mother were made.

The suggestion then being made that the contract was lost, which was not disputed, he was permitted to testify as to its contents, over objection on the ground that it related to a transaction with a deceased person. He also testified that he turned his contract over to his father the same day for safe-keeping, objection being interposed by defendants to this as a transaction with a deceased person. The court overruled the objection.

On cross-examination, referring to his direct examination as to the transaction of December 23, 1901, in Mr. Ekern's office, he was asked by defendants' counsel who was present at the time that he signed his copy and his father's copy. He was then interrogated concerning certain portions of his adverse examination before trial on the subject of how many copies were executed and whether he had not there testified that he had signed his name only once and that he did not carry the paper away with him and had not seen it since. He was further cross-examined as to the contract providing that he was to have possession immediately; as to the form of the contract, and as to when he signed the document, answering that he signed it after his father and mother had signed it.

On redirect examination plaintiff's counsel asked to have the witness testify as to all that was said between his father and himself at the time of the execution of the contract. The court held that there was not sufficient opening of the door by the adverse party to permit him to so testify, and nothing further was done in this regard on the trial.

We think that the use on the cross-examination of the plaintiff by defendants' counsel of the portion of the deposition of plaintiff as an adverse witness was sufficient opening of the door to permit the witness's testimony as to his signing of the contract after the father and mother had signed it to stand as a part of his case.

Manifestly if this examination of the plaintiff had been made at the trial by defendants calling him as an adverse witness under sec. 4068, Stats., the door would have been opened by such examination to permit the plaintiff to testify in that regard at least. *Drinkwine v. Gruelle,* 120 Wis. 628, 632, 98 N. W. 534. It was as effectual as though it had been based upon an express offer on defendants' part so to examine as to the transaction, as in *Johnson v. Bank of Wisconsin,* 163 Wis. 369, 373, 158 N. W. 59.

Furthermore, the defendants themselves made all the plaintiff's testimony on his adverse examination part of the record in this case by their offer of the whole of the deposition without qualification or reservation of any kind at the closing of the testimony. While it is true that such a deposition is not a part of the record on the trial until it be offered, yet the express right is given by sub. 2, sec. 4096, Stats., to the party taking the examination to offer the same whether the party so examined be present or not. It is also true that such cannot be offered by the party whose deposition is thus taken (*Lange v. Heckel,* 171 Wis. 59, 175 N. W. 788, and followed in *Thomas v. Lockwood Oil Co.* 174 Wis. 486, 182 N. W. 841), yet by defendants' own offer of the deposition they made it their own evidence, subject to proper objections to the whole or parts thereof by the other party. *Maldaner v. Smith,* 102 Wis. 30, 40, 78 N. W. 140; *Sioux Land Co. v. Ewing,* 165 Wis. 40, 45, 160 N. W. 1059. The testimony thus made a part of the record may as properly be used by the plaintiff in the consideration of this case as though he had been called in surrebuttal to testify as to

transactions concerning which the defendants had already thus offered evidence, as was done in the case of *Anderson v. Anderson*, 136 Wis. 328, 331, 117 N. W. 801.

We are satisfied, therefore, that there was in the record ample to support the finding of the court that there was a signing of this land contract by the plaintiff as well as by the father and mother, that it covered the property in question, that its terms were substantially as testified to by the plaintiff and the other witnesses, and that it was intended to be and considered an effectual transaction whereby the minor son, then a member of the family and under the father's direction and control, became vested with the same rights in and to the real estate described in his land contract as did the sons *George* and *Alfred* in their respective pieces. That possession was not taken by *Lloyd* of his piece of land, as was done by *Alfred* and *George* of their respective portions, that no accounting was ever demanded by *Lloyd* during his father's lifetime, and no assertion of ownership made by him during that period, is not sufficient in our judgment, in view of the situation and relationship existing between the two, to overthrow the findings of the trial court.

The plaintiff was not permitted to testify as to any express agreement between his father and himself in December, 1901, for the carrying on of the farm thereafter, if any such agreement were made, and the findings excepted to by defendants to the effect that there was such agreement are without direct evidence for their support; but in view of what has already been said such findings are not essential to support the judgment and may therefore be disregarded.

It is also unnecessary to consider whether actual manual delivery of a land contract by the grantor to grantee is essential in order to perfect the contract, for there is sufficient evidence, as indicated above, to warrant the court's conclusions that the transaction between the father and the plaintiff was completed. The relationship between the parties; the evident understanding by all members of the family that

*Lloyd* was not fitted for the work required to successfully manage a farm of that size, and that he was, with his parents' evident approval and consent, occupied in other pursuits; that the father was so situated that he could in a general way supervise the management of this farm and did arrange to have it conducted by the sons *Alfred* and *George* or their respective sons; the hesitancy that would naturally arise between a son so placed as was the plaintiff, on evidently affectionate terms with his father, to deal with such parent of whose bounty he was thus a beneficiary on a strictly business basis, all are amply sufficient to justify the conclusion of the trial court that there was no abandonment by *Lloyd* of the rights that he secured by the transaction of December 23, 1901.

Under the stipulated facts agreed to by the parties to this action it was evident that an accounting would have been an idle ceremony, as it stands conceded that the receipts and proper disbursements in the conduct of this farm balanced.

It follows from what is said that the conclusion of the trial court that the plaintiff is entitled to have it declared that he is the owner of the farm in question can and should be upheld.

*By the Court.*—Judgment affirmed.

SIEBECKER, C. J. (*dissenting*). I cannot concur in the decision and opinion of the court. Permitting the plaintiff to testify to transactions with his father concerning the signing and delivery and plaintiff's redelivery of the land contract in December, 1901, as detailed in the statement of the case and the opinion of the court, clearly shows, in my opinion, that the trial court erred in receiving plaintiff's evidence of those transactions over defendants' objection under sec. 4069, Stats. Nor can I concur that defendants waived this objection by their offer of plaintiff's deposition as an adverse party without qualifications before the reception of evidence was closed. To hold that such offer so made after the court

had erroneously admitted evidence of the substantial and material parts of such transactions with the deceased was an opening of the door on this subject by defendants, seems to me contrary to the intent of the parties. Such offer by defendants of plaintiff's adverse examination was manifestly induced by the court's erroneous ruling in admitting at the trial plaintiff's oral testimony of these transactions with his deceased father. In view of the court's action on this subject defendants' counsel naturally supposed that all plaintiff had testified to on this point was before the court and would be considered in deciding the case. It seems plain to me that this court's decision on this phase of the case is a misinterpretation of the defendants' purpose in thus finally meeting the trial court's erroneous rulings under the provisions of sec. 4069, Stats. A study of the evidence persuades me that the trial court's findings that plaintiff's father conveyed title by contract to the farm in question in December, 1901, are not sustained by the record on which the trial court acted. Furthermore, if the evidence of plaintiff concerning the transaction between him and his deceased father in December, 1901, be excluded from the case, as I think it should be, because incompetent under sec. 4069, Stats., then there is no evidence in the case to sustain the plaintiff's case.

I am of the opinion that the trial court committed prejudicial error in receiving plaintiff's evidence of the transaction with his deceased father and improperly based its findings on such evidence, and that there is no legal evidence to sustain the judgment and it should be reversed.

I am authorized to state that Mr. Justice OWEN concurs in this dissent.

A motion for a rehearing was denied, with $25 costs, on December 13, 1921.